## LUNDBERG v. PRUDENTIAL STEAM-SHIP CORP. et al.

United States District Court
S. D. New York.

March 31, 1951.

Motion for Reargument and Modification
Denied June 27, 1951.

William L. Standard, New York City, by Louis R. Harolds, New York City, for libellant.

Barry, Wainwright, Thacher & Symmers, New York City, by John C. Crawley and Edward C. Kalaidjian, New York City, for respondents.

Purdy, Lamb & Catoggio, New York City, by Vincent A. Catoggio, New York City, for respondent-impleaded. ·

BONDY, District Judge.

This is a libel to recover damages for personal injuries alleged to have been sustained by libellant aboard the S. S. Edwin L. Drake as a result of the unseaworthiness of the vessel and the negligence of the respondents, Prudential Steamship Corporation and American Trans-Ocean Navigation Corporation, who owned, operated and controlled it. Respondents impleaded Triangle Ship Maintenance, Inc., an independent contractor, the employer of libellant, and seek indemnity from it for any recovery that may be had against them by libellant.

At about 8:00 A.M. on July 11, 1949, while the Drake was moored to a pier at a shipyard in Brooklyn, N. Y., a gang of approximately 30 painters, including libellant, boarded the Drake and began to clean, scrape and paint her 'tween decks and lower holds under the supervision of two foremen, pursuant to a contract previously entered into between respondents and respondent-impleaded. The painters and their foremen were all employees of respondent-impleaded. In painting the sides of the 'tween decks some of the men used stepladders provided by their employer, but there were not enough ladders available and a number of the painters, including libellant, climbed up on the ship's cargo battens to do the work. In the lower holds, where there were no ladders at all, the painters used the battens exclusively to reach the sides. They worked till about 5:00 P.M.

The following day work was resumed and performed in the same manner. At about 10:00 A.M. permission was obtained from the Marine Painters' Union for libellant and two others to use spray guns. Equipped with a spray gun, libellant continued to use the battens in the 'tween decks that morning until he had completed his work there. In the afternoon libellant and a fellow worker, Fasten, went down into lower hold No. 3. The hold was approximately $27\frac{1}{2}$ feet high and 50 feet long. The sides were lined vertically with metal ribs, spaced about 2 feet apart and extending inward from the sides of the ship a distance of 8 inches to a foot. Cleats about 2 inches in width were welded onto every other rib and

thus spaced about 4 feet apart, and were lined up vertically, one under the other, at about two-foot intervals. In these cleats rested wooden batten boards about 2 inches thick, 6 inches wide, and 16 feet long, and running horizontally. The sides of the hold were straight up and down until they reached a point 4 or 5 feet from the bottom, where they met metal bilge plates extending at a 45-degree angle from the bottom.

A rolling scaffold about 15 feet high was standing at the forward part of the hold along the starboard side. Libellant and Fasten climbed to the top of this scaffold and began to paint the overhead and upper portion of the forward bulkhead. After about 10 minutes on the scaffold libellant descended with his hand spray gun and, preparatory to climbing the battens, proceeded to walk along the starboard side of the hold surveying the battens and testing a few with his hand. Satisfied with this casual inspection, he climbed up to the third or fourth batten from the top at the forward end of the hold and began to paint with his spray gun and when required scraped off rust with his pocket scraper as he worked his way aft. By 4:00 P.M. he had covered almost one-half of the upper forward portion of the starboard side and upper corners of the hold. It then became necessary for libellant to refill his paint tank, and accordingly he hung his spray gun on a batten board and began to descend with a line of cleats directly in front of him. Holding on to a batten board with both hands, he stepped down on the board beneath him with his right foot, after having tested it with his foot and feeling that it was secure. This brought his right foot immediately alongside, and to the right of, a cleat. Then he stepped down with his left foot, which he placed immediately alongside, and to the left of, the same cleat. The board still felt secure. At this point libellant was standing on about the fourth or fifth batten from the top, about 8 feet from the left end of the batten board and the same distance from the right end. Libellant then raised his right foot and simultaneously released his grip with his right hand from the upper batten, for the purpose of descending to the next lower batten, thereby shifting his entire weight temporarily to his left side. At that instant the board on which his left foot was resting gave way, causing him to fall a distance of approximately 18 feet to the hold below. In falling libellant twisted his body and was thrust outward sufficiently to cause him narrowly to avoid hitting the bilge plate. He landed on his feet and then fell forward. Thereafter libellant was removed from the hold by a net, placed in an ambulance and taken to the Long Island College Hospital.

The batten board gave way on its left side and fell to the bottom of the hold under libellant's weight because a cleat was missing from the rib of the ship about 4 feet to the left of where libellant had been standing, and also because the left end of the board did not rest in any cleat, being too short to fit into the next cleat to the left, which was about 8 feet to the left of the point from which libellant fell.

At the time of the accident libellant weighed about 145 pounds and if the batten board had been secured on the left side, it would have supported his weight.

In Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, the Supreme Court extended a shipowner's warranty of the seaworthiness of his vessel to cover longshoremen as well as seamen. Libellant contends that the rationale underlying the Sieracki decision is equally applicable to marine painters employed by an independent contractor inasmuch as they perform a work essential to maritime service which was formerly performed by members of the crew. The Court of Appeals, Second Circuit, however, has given a narrow interpretation to the Sieracki case and has refused to extend it to employees of independent contractors engaged in making ship repairs. Guerrini v. U. S., 2 Cir., 1948, 167 F.2d 352, 354; see O'Connell v. Naess, 2 Cir., 1949, 176 F.2d 138, 140. Hence there can be no recovery in this case in the absence of proof of negligence on the part of respondents.

Under the law of New York, which is applicable for the purpose of determining whether respondents were negligent, libellant was a "business guest"

aboard the Drake and as such respondents owed him a nondelegable duty "to use reasonable care to make the premises reasonably safe or else give warning of the danger." Spaulding v. Parry Navigation Co., 2 Cir., 187 F.2d 257, 260; Guerrini v. U. S., supra, 167 F.2d at pages 354–356; Puleo v. H. E. Moss Co., 2 Cir., 159 F.2d 842, 845. Respondents admit that they did not make any effort to maintain the batten boards in a condition suitable for climbing. They contend that they were under no duty to do so because the battens were not intended to be used as ladders but simply to prevent cargo from coming into contact with the skin of the ship. See Sulsenti v. Cadogan S. S. Co., Ltd., D.C., 54 F.Supp. 570; The Queen Elizabeth, D.C., 209 F. 712, 713; Aurigemma v. Nippon Yusen Kaisha Co., 238 N.Y. 183, 187, 144 N.E. 495. Nevertheless if respondents knew or should have known that the painters were using, or likely to use, the battens in the lower holds to gain access to the sides, they were under a duty to provide against the admittedly dangerous practice. Lopez v. American President Lines, Ltd., 2 Cir., 138 F.2d 914. A number of marine painters testified that they invariably climbed cargo battens in order to paint the sides of ships' holds and that in all their experience that was the only way they had ever seen the job done. On the other hand, respondents' witnesses, not one of whom was a marine painter, testified that they had seen marine painters use various types of staging, scaffolding and ladders to reach the sides, but never battens. Their occupations however were such that their opportunities to observe how painting was carried on in ships' holds were limited. On the present record the court finds that at the time of the accident it was a very common, if not universal, practice among marine painters in and around the Port of New York to use battens as stepladders in order to paint the sides of ships' lower holds.

Furthermore, the evidence is clear that painters had been working from the battens in the lower holds of the Drake for almost two days before the accident and that they continued to do so for a few days after the accident and until the job had been completed. The Chief Mate testified that he went down into the holds twice each day, that he did not see any painter working from the battens, and that had the practice come to his attention he would have put a stop to it. It seems strange, therefore, that after learning of the accident he did not make any effort to determine whether any of the other painters were following the same dangerous practice. Similarly, respondents' Port Captain, who testified that he had spent ten or fifteen minutes in every hold on each of the two days in question, professed to be ignorant of the method employed by the painters to reach the sides of the ship. But even though respondents' representatives may not have had actual knowledge of the practice, under the circumstances they should have known about it and must be charged with constructive notice. Thus the failure of respondents to provide against the practice constituted negligence. Lopez v. American President Lines, Ltd., supra.

With respect to the issue of contributory negligence, libellant testified that before climbing up on the battens he looked them over, tested a couple with his hand, and was satisfied that they looked "fairly good". This he accomplished in "not more than" four or five minutes "at the most". It was generally known among marine painters that battens, unless lodged firmly in their cleats, are dangerous if used as ladders. For that reason reasonable caution required more than a casual inspection by any one about to climb on them. A reasonably prudent inspection would have disclosed that a cleat was missing and that it was unsafe to step on the batten that ultimately tilted and gave way. Since the degree of care used by libellant in surveying the battens was not commensurate with the risk involved, he must be held contributorily negligent. This is by no means tantamount to saying that libellant was actually aware of the dangerous condition. Though libellant was negligent in his inspection of the battens, he did not know that the batten in question was loose and that a supporting cleat was missing. Cf. Spaulding v. Parry Navigation Co., supra.

The extent to which contributory negligence is a defense is procedural and hence governed by the law of the forum. See Guerrini v. U. S., supra, 167 F.2d at page 355. Therefore the law of New York is not pertinent and the admiralty rule of comparative negligence applies. In view of the fact that libellant had little choice but to work from the battens, cf. Koenig v. Patrick Constr. Corp., 298 N.Y. 313, 318–319, 83 N.E.2d 133, 10 A.L.R.2d 848, and the probability that the cursory nature of his inspection of them was at least partially due to the fact that he was required to work expeditiously, his negligence was not as great as that of respondents. The court is of the opinion that respondents' fault was twice as great as libellant's fault, and so that libellant is entitled to recover two-thirds of the damages sustained by him.

The primary injury to libellant as a result of his fall was a compression fracture of the 12th dorsal vertebra. In addition, he suffered contusions and sprains of the right wrist and ankle. Libellant still limps slightly, but his fracture has healed completely. Due to his fear of being jostled in crowds, he still persists, when going outdoors, in frequently wearing a back brace which was given to him when his cast was removed; he also wears it indoors when his back begins to tire him. He has not worked at all since his accident, and as long as he continues to wear his brace will be unable to resume his normal occupation. Certainly he is in no condition to do so today. Although the medical testimony was conflicting, the court believes that there is no injury to libellant's spinal cord or nervous system; that the present stiffness of his back and atrophy of his lumbar muscles are due in large measure to his unnecessary use of the brace and that if he were to discard it, perform appropriate exercises and fully co-operate with his physician he would be able to rehabilitate himself completely within one year.

There is evidence that in two recent years the libellant earned about $5100 and $5600 respectively. Allowing as average annual earnings prior to the accident $5000, he had lost $6666.65 in wages up to the time of the trial. Allowing an additional year

for his complete rehabilitation, his loss of earnings in the future will be $5000. He is further entitled to $3500. for pain and suffering, both past and future, and $1178.35 for hospital expenses and doctors' fees, making his total damages $16,345.00. Reducing these by one-third for libellant's contributory negligence, he is entitled to a decree for $10,896.67. On this amount the compensation carrier has a lien for $1,798.35 representing compensation paid to libellant prior to the institution of this action and medical expenses paid on his behalf.

Since by operation of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 904–905, 933–935, libellant has no claim for damages, but merely one for compensation, against his employer, respondents have no right to contribution against libellant's employer on the theory that they were joint tort-feasors. "For a right of contribution to exist between tort-feasors, they must be joint wrongdoers in the sense that their tort or torts have imposed a common liability upon them to the party injured. In the case at bar the shipowner and the stevedoring firm were not under a common liability to the injured employee, nor were they joint wrongdoers. His claim against his employer was not for damages, as was his claim against the shipowner, nor was it dependent upon any tort committed by his employer." American Mut. Liability Ins. Co. v. Matthews, 2 Cir., 182 F.2d 322, 323. Nor is there any express contract of indemnity between libellant's employer and respondents. The latter's right to be indemnified, therefore, must rest solely on common-law principles. Such right turns on whether there was a breach of a contractual duty owed by the independent contractor to respondents to do the work properly and, if so, whether the breach was the primary cause of the employee's injury. See American Mut. Liability Ins. Co. v. Matthews, supra, 182 F.2d at page 324; Rich v. U. S., 2 Cir., 177 F.2d 688, 691; Burris v. American Chicle Co., 2 Cir., 120 F.2d 218, 222; Slattery v. Marra Bros., 2 Cir., 186 F.2d 134.

Libellant's employer had promised respondents that it would furnish equipment to paint the lower holds. A necessary

implication of this promise, even without reading the New York Labor Law into the contract, was that the equipment would be adequate for the job. So far as appears there were no ladders aboard ship long enough to reach the upper portions of the sides of the holds. The only equipment in lower hold No. 3, aside from the spray guns carried by the painters, was a rolling scaffold. This was used in painting the overhead but not the sides of the ship. Nor was it intended or suitable for the latter purpose. The bilge plate in lower hold No. 3 had a slope of 45 degrees and was so constructed as to make it impossible to roll the scaffold closer than four or five feet to the battens, and even with a four-foot spray gun, which could spray paint satisfactorily at a distance of two and a half feet, a painter could not stand on the scaffold and observe the effects of his work behind the battens or behind certain obstructed areas where the sides met the overhead. Nor would he be in a position properly to perform his incidental task of scraping any rust spots missed by the regular scrapers who preceded him. Although respondents' Port Captain testified that he considered the equipment provided by libellant's employer adequate for the job, the court cannot give great weight to his testimony. The most that can be said for his alleged belief is that if it was honest, it was sadly mistaken. The impracticability of libellant using the scaffold in question to paint behind the battens is further demonstrated by the fact that another painter was then using the scaffold to reach the overhead. The court is convinced that libellant's employer never intended its employees to resort to such a time-consuming and inefficient method of painting the sides of the holds and that it failed to provide the necessary equipment to enable them to paint the sides in safety. This breach of its contractual duty to respondents also constituted a violation of Section 240(1) of the New York Labor Law, McK.Consol.Laws, c. 31. That section provides in part: "A person employing * * * another to perform labor of any kind in the * * * painting * * * of a * * * structure shall furnish or erect, or cause to be furnished or erected

for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed * * *."

The independent contractor's breach of its contractual duty to perform the work properly by failing to provide adequate equipment for its employees was the primary cause of libellant's injuries. Respondents accordingly are entitled to indemnity. Burris v. American Chicle Co., 2 Cir., 120 F.2d 218; Rich v. United States, 2 Cir., 177 F.2d 688; see Slattery v. Marra Bros., supra.

A decree in accordance herewith is to be submitted.

### On Motion for Reargument.

Respondent-impleaded has moved the court to amend its opinion of March 31, 1951, and to decide that respondent-impleaded should not be required to indemnify respondents for the damages for which they are liable to libellant.

The respondents are not estopped from denying full performance of the contract between them and respondent-impleaded because respondents' Port Captain, called by them as a witness, testified that he did not have any complaint about the equipment furnished by respondent-impleaded, and that it was in full compliance with the contract. The evidence does not disclose that the Port Captain was authorized to make any such admissions, or to waive a possible cause of action by respondents against the respondent-impleaded. Moreover, the interpretation of the contract was a question for the court. Upon all the evidence adduced, the court reaffirms its finding that the contract was not fully performed by respondent-impleaded.

The liability of respondents to libellant does not rest on the impleaded respondent's breach of contract but solely on a slender base—their failure, after they were chargeable with notice that the impleaded respondent's employees were climbing the cargo battens, either to warn the libellant that the battens had not been inspected and that some of them might not be firmly

lodged in their cleats or that cleats might be missing; or upon their failure to put a stop to the painters' misuse of the battens. It was generally known among painters that it was dangerous to climb battens unless firmly lodged in their cleats; but libellant, because of his employer's failure to furnish him with adequate equipment, did not have any means for painting the sides of the hold other than to climb the battens.

Respondents' liability accordingly rests chiefly on their failure to stop the misuse of the battens which had been forced on libellant by the impleaded contractor's failure to provide him with equipment adequate for the job.

The third contention is based on the court's finding, on the present record, that it was a very common, if not universal, practice among marine painters in and around the Port of New York to use battens as stepladders in order to paint the sides of ships' lower holds. It is argued that in view of the supposed universality of the practice, the respondents and respondent-impleaded must be presumed to have contracted with knowledge of this custom, and that the parties understood that the battens would be used in painting the sides. It is further contended that since the practice of climbing battens was found by the court to be so widespread, it must be inferred that the libellant would have climbed the battens even if respondent-impleaded had furnished him with adequate equipment, and that consequently the impleaded respondent's failure to do so had no causal relation to libellant's use of the battens and the resulting accident.

It was not the court's intention to find that the practice of climbing battens prevailed even when adequate equipment for painting the sides of ships' lower holds was furnished to the painters engaged in that work. There is no basis for such a finding in the present record. The practice of climbing battens was common because, so far as appears from the record, it was common to require painters to do that work without furnishing them with equipment adequate for the job. There was not any evidence whatsoever that painters used battens even when furnished with proper equipment; and no such inference can be drawn.

The court accordingly now finds, as was already implied in the opinion, that it is probable that libellant would not have climbed the battens if he had been furnished by respondent-impleaded with safe and practicable equipment for doing this work; and that it was his employer's failure to furnish such equipment which forced libellant to engage in that dangerous misuse of the battens, and which was thus, in view of the relatively slight fault on the part of respondents, the primary cause of libellant's injuries.

The contention that the respondents and the respondent-impleaded impliedly incorporated the supposedly general practice of climbing battens into their contract is therefore seen to be untenable. The practice of climbing battens was general only when adequate equipment was not furnished; therefore the respondents can scarcely have foreseen that practice, unless the parties tacitly agreed that adequate equipment would not be furnished. Since failure to furnish such equipment constitutes common-law negligence as well as a direct violation of the New York Labor Law, persuasive evidence would be required before the court could reasonably conclude that the parties had impliedly agreed that the work should be done in a doubly unlawful manner. Not even a scintilla of evidence to support this contention was offered.

The respondent-impleaded also contends that the applicable law of indemnity has been misconstrued. It relies on Seamanchuck v. Fifth Ave. & 37th St. Corp., 1943, 290 N.Y. 412, 49 N.E.2d 507, and Walters v. Rao Electric Equipment Co., 289 N.Y. 57, 43 N.E.2d 810, 143 A.L.R. 308 (1942). These cases, however, have been limited specifically to situations involving the erection or demolition of a building, and the continued vitality of the common-law rule of indemnity for other situations has been reaffirmed, in the most recent decision in that field by the New York Court of Appeals. Wischnie v. Dorsch, 1947, 296 N.Y. 257, 72 N.E.2d 700.

Also relied on is Union Stock Yards Co. of Omaha v. Chicago, B. & Q. R. R., 1905, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453; but in that case the alleged indemnitor and indemnitee were equally negligent, so that the decision is not in point here.

In the present case there is present that "legal transaction between the two corporations, other than that of joint tortfeasors: such as contract * * *." referred to by the Court of Appeals for this Circuit in Slattery v. Marra Bros., 1951, 186 F.2d 134, 138. The breach of impleaded respondent's contract primarily brought about the libellant's injury, which in turn imposed a legal liability upon the respondents. Under these circumstances, the respondents are entitled to indemnity.

As is said by Bohlen, Studies in the Law of Torts, at 512: "Indemnity is given to the person morally innocent but legally liable, as against the actual wrongdoer whose misconduct has brought liability upon him."

The motion for reargument and modification of the prior opinion is denied.