## CARTER v. KURN et al.
### No. 11985.

Circuit Court of Appeals, Eighth Circuit.
April 27, 1942.

416

See, also, 8 Cir., 120 F.2d 261.

M. B. Grace, of Birmingham, Ala., for appellant.

E. L. Westbrooke, of Jonesboro, Ark. (E. G. Nahler, of St. Louis, Mo., and E. L. Westbrooke, Jr., of Jonesboro, Ark., on the brief), for appellees.

Before GARDNER, THOMAS, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This was an action for damages for the death of Edward Stanley Harp, appellant's intestate, who met his death while a passenger on one of appellees' trains. Appellant is the administrator of the estate of Edward Stanley Harp, deceased, and brings the action for the benefit of the estate, heirs, and next-of-kin of the intestate. Appellees are the trustees operating the St. Louis-San Francisco Railway Company, and the St. Louis-San Francisco Railway Company.

The appellant will be referred to as plaintiff, and the appellees will be referred to either as defendants or the railway company.

Defendants having admitted that Edward Stanley Harp was a passenger on one of the trains operated by them at the time of his death, the trial court held that this admission gave rise to a presumption of negligence on the part of the defendants under Section 11138, Pope's Digest of the Arkansas Statutes, 1937, and made a prima facie case in favor of plaintiff, which defendants were required to meet by their evidence. The court also ruled that defendants were entitled to the opening and closing arguments. Plaintiff, by amendment, limited his pleading to a charge of general negligence only.

After defendants had submitted their testimony, plaintiff introduced certain evidence in rebuttal, whereupon defendants moved for a directed verdict in their favor, which the court granted, and on the verdict

so directed entered judgment of dismissal on the merits.

 Plaintiff seeks reversal on the ground that he was entitled to have the case submitted to the jury on the record as made. The question here presented must be determined by the law of Arkansas. Erie Railroad Company v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. In reviewing this question we must consider the evidence in the light most favorable to plaintiff and resolve all conflicts in the evidence in his favor. He is also entitled to the benefit of such favorable inferences as may reasonably be drawn from the testimony. Champlin Refining Co. v. Walker, 8 Cir., 113 F.2d 844; Egan Chevrolet Co. v. Bruner, 8 Cir., 102 F.2d 373, 122 A.L.R. 987; Johnson v. J. H. Yost Lbr. Co., 8 Cir., 117 F.2d 53. So viewed, the facts may be stated substantially as follows:

Edward Stanley Harp, plaintiff's intestate, a man about seventy-five years of age, was a passenger on a coach ticket entitling him to transportation from Dundledon, Florida, to Clovis, New Mexico. He boarded the train at Dundledon, Florida, January 11, 1936. He was routed over the Seaboard Air Line from Dundledon, Florida, to Birmingham, Alabama, and over the lines of the St. Louis-San Francisco Railway from Birmingham, Alabama, to Kansas City, Missouri. He was a sufferer from some bowel and kidney troubles, and when he boarded the train at Dundledon, his son instructed him to ride in a "seat near the men's toilet." He arrived in Birmingham on the evening of January 12th. After he left Birmingham, he was in a seat in coach No. 1085, described as a combination coach, one section being for white male passengers, sometimes referred to as the smoking car, and the other section, the head end, being for colored passengers. He was seated in a double seat near the rear and on the north side of the aisle, near the door of the toilet, which was on the south side of the aisle at the end of the car. This combination car followed the baggage, mail and express cars, and was in turn followed by what is referred to as the ladies' coach—a car for both men and women—then three Pullman cars. The train crew changed at Memphis, Tennessee, and the train left there at 7:30 p.m. Soon after leaving Memphis, the conductor called on Harp for his ticket. The conductor says:

"He fumbled around through his pockets and said he didn't have any ticket and couldn't find it, and I said, well, you have a ticket some place, you had better feel in the other pocket."

The ticket was located.

The first stop made by this train after leaving Memphis was Jonesboro, Arkansas, at 9:05 p.m., at which time Harp was in his seat in the combination car. At Jonesboro, the door on the south side of the vestibule of the ladies' coach was opened for use of passengers getting off or getting on the ladies' coach or the combination car. When the train left Jonesboro, Harp was in his seat, but when it stopped at Hoxie, Arkansas, which was the next regular stop, about twenty-two miles from Jonesboro, he was missing. About 5:30 the following morning, his dead body was found on the north side of the track between Jonesboro and Hoxie. Both of his legs were broken, his right arm had been torn from the shoulder, and there were other wounds and lacerations on the head and body. The wooden cattle guard on the north side of the track near where the body lay, was demolished. The train had been traveling between fifty and sixty miles an hour. The coroner, called as a witness by the defendants, testified, among other things, as follows:

"I was notified of the finding of the body, and found the body when I arrived on the north side of the tracks or west of the cattle guard, and on examination I found the left leg was broken below the knee, the right arm torn from the body near the shoulder joint. This arm was also broken below the elbow. Also cuts and scars on top of the head. Had tape across back showing tape had been worn for some time. Evidence shows that the east cattle guard was torn down violently by the body and the planks were scattered to the west of the guard. The body was without shoes or hat. The coroner's jury was empaneled with twelve men and they came to agreement that the deceased came to his death by being thrown from Frisco passenger train 106 traveling west January 12 about 9:30 p.m."

The railway in fact extends in a northwesterly and southeasterly direction, and sometimes it is referred to as running east and west, while at other times it is referred to as running north and south. The train crew consisted of the engineer and fireman, who were on the locomotive, the conductor,

a flagman or brakeman, and a porter. There was also a news agent on the train, whose wares were stored on the rear platform of this combination coach, up against the north door of the vestibule and on top of the trap door over the north vestibule steps. We assume too, though there is no evidence on the question, that each of the three Pullman cars had a porter, and there may have been a Pullman conductor for the group of Pullman cars, all of whom had license to be on and about the train.

Witnesses for the defendants testified that the north vestibule doors were not opened at Jonesboro and that it was not possible to open the north vestibule door at the rear end of the combination coach because the news agent's wares were there stored. They also testified that the vestibule door which had been opened on the south side at Jonesboro, was closed on leaving the station. The flagman or brakeman was not produced and did not testify; neither did the news agent, whose goods occupied the vestibule on the rear end of this combination car. Neither was either of the porters on the Pullman cars produced. Of the train crew, only the conductor and porter testified. A special agent or inspector testified that he had looked over the north side of the train at Jonesboro and that the vestibule doors on that side were all closed.

■ The railway company as a common carrier was required to exercise the utmost care to protect its passengers from the possibility of an accident arising from the condition of its vestibule traps and doors, and to see to it that they were not only closed when the train left the station, but that they were kept closed while the train was in motion. This being the duty of the company, the passenger was warranted in assuming that these traps and doors were closed and that the vestibule was a safe passage from car to car. St. Louis, I. M. & S. R. Co. v. Oliver, 92 Ark. 432, 123 S. W. 662; Minneapolis, St. P. & S. S. M. R. Co. v. Galvin, 6 Cir., 54 F.2d 202; Wagoner v. Wabash R. Co., 118 Mo.App. 239, 94 S.W. 293. The Supreme Court of Arkansas, in St. Louis, I. M. & S. R. Co. v. Oliver, supra [92 Ark. 432, 123 S.W. 663], said:

"One of the chief objects of a vestibuled train is to furnish to the passenger a safe and convenient way of passage from one car to another; and, in order for such passageway to be safe, ordinary prudence demands that the trapdoors should be over the steps. It was not only the duty of the

servants of the defendant in this case to close these trapdoors, but it was their further duty to exercise the highest care to see that they were kept in this condition."

The Circuit Court of Appeals of the Sixth Circuit, in Minneapolis, St. P. & S. S. M. R. Co. v. Galvin, supra [54 F.2d 203], considered the responsibility of the carrier with reference to the condition of its vestibule traps and doors. The court there said: "Appellant was bound to use the utmost care to protect its passengers against the possibility of an accident arising from the condition of its vestibule traps and doors, and to this end to see that they were kept closed while its trains were in motion. * * *"

■ The cars on this train were all air-conditioned, and the windows were bolted down and none of them was opened nor broken. Witnesses for the defendants stated that Harp could only have escaped from the car through a north vestibule door. The proof showed that all these traps and vestibule doors were in good condition and that they were closed at all times observed after the train left Jonesboro. The apparent purpose of the testimony was to show that the passenger could not have gotten off the car after it left Jonesboro, but the physical facts show conclusively that he did get off and must have gotten off through a vestibule door on the north side. Oral testimony loses its probative force when contradicted by admitted physical facts. A vestibule door on the north side of this train was opened, and the jury, notwithstanding the oral testimony, might well have believed that it was opened by a railway employee and not by Mr. Harp. This conclusion is strengthened by the evidence of the employees who testified on behalf of the defendants. Thus, Orin Nearguard, who was the train porter, testified as follows:

"Q. It takes a trainman with two hands to operate that outside door before it can come open, does it? A. Yes, sir.

"Q. And you raise the trap by the spring, by stepping on a little latch that releases the platform? A. Yes, sir.

"Q. And that is the first thing that comes up? A. Yes, sir.

"Q. Then you open the door? A. Yes, sir.
 * * * * * *
"Q. Now, the trainman in operating one of the latches that hold that door has got to know how to operate it, hasn't he? A. Yes, sir.

"Q. A green man couldn't operate that right and open the door, could he? A. No, sir.

"Q. It would have to be a man with experience who knows how to operate it and open it? A. Yes, sir."

The conductor, referring to the vestibule door and trap on the ladies' coach, among other things, said: "Well, that's a different car from this, and you could open the door first, but it also had a safety at the top and you have to turn the catch and turn the door all at the same time."

This same witness also testified:

"Q. If that vestibule door was open, and by the motion of that train he could have been thrown out too, couldn't he? A. No, I don't think so, not that vestibule door. *He might have gotten out, but he couldn't open that door.*"

There was other testimony of the same character, justifying a finding that the door had been opened by one of the train crew. It has been observed that the flagman was not called, but even if he had been, the jury, in face of the physical facts and the testimony that it required an experienced trainman to open these doors, might well have disbelieved the oral testimony. This train, it will be remembered, was traveling at a rate of about sixty miles an hour. The porter testified as to the probable result of this passenger attempting to walk from the combination car to the ladies' coach as follows:

"Q. And if the trap was down or up and the outside door was open, the motion of that train would throw him to the side and he would fall down these steps? A. Yes, sir.

"Q. That is true? A. Yes, sir.

"Q. And the only way he could get off that train is through that door? A. Yes, sir."

Harp had been occupying his seat in the smoking compartment for a long time. His ticket entitled him to go into and to occupy a seat in the ladies' coach if he might wish to change his environment, or if he had desired to walk from one car to the other as a matter of relaxation. It is possible too that the toilet on the combination car may have been occupied, and he may have had occasion to go to the next coach seeking toilet facilities.

It is worthy of note, in view of the mystery which surrounds this accident and the testimony tending to show the impossibility of the passenger having escaped through a north door of the train, that the conductor, while at Jonesboro, may have opened the vestibule door on the north side. He testified that he went back through this train and dropped off the rear end of the last Pullman as the train stopped at Jonesboro. He went to the telegraph office to get orders for the train and then went to the engine with his orders and delivered them to the engineer. Now, the engineer was on the north side of this locomotive as it stood at Jonesboro and the conductor says he came back and entered the head end of this combination coach. His testimony in that regard is substantially as follows:

"I got on that train that night in leaving Jonesboro on the head end of the car that the gentleman was riding in.

"Q. Now the trap was at the south end of that car where the old gentleman was riding? A. It was right in the southern end.

"Q. The southern end. You got on the north? A. I got on the north.

"Q. How did you get on, was there a trap there for you to get on? A. I had to open the trap to get on, or break down the door. You see I have to get off here, get off that train at the rear of the train. because the engine goes to the tank and the telegraph office is further back up this way at Jonesboro, and I get off the rear of the train right at the telegraph office, and I always get orders for the train or something, and I then go to the engine with my orders and deliver them to the engineer, and by the time I get the work done up here we leave town, and I get on at the front of 1085 (the combination coach)."

He testified that the door was shut and that the trap had been left open by him, and that through the trap he opened the door. Now, there is no evidence that this door and trap were afterwards closed. True, the witness also testified that he got on the south side of the train at the front end of this coach but it was for the jury to resolve this conflict in his testimony. Considering the evidence in connection with all the attending circumstances and the physical facts in a light most favorable to plaintiff, and giving him the benefit of all reasonable inferences that may be drawn, we can not say that all reasonable men must have found the issue in favor of the defendants.

But it is argued by appellees that plaintiff's right of recovery is based solely

upon the presumption afforded by the Arkansas prima facie statute (Sec. 11138, Pope's Digest of Arkansas Statutes) which provides that, "All railroads which are now or may be hereafter built and operated in whole or in part in this State shall be responsible for all damages to persons and property done or caused by the running of trains in this State," and that by the introduction of testimony the defendants have overcome this presumption. This statute only determines the party who has the duty of going forward with the evidence, and when that duty is met by the production of evidence sufficient to sustain a finding that the accident did not result from any negligence on behalf of the defendants in operating the train, then the presumption vanishes, and the jury should consider the proof free from such presumption. The presumption is not evidence. The basic facts which give rise to the presumption, however, as distinguished from the presumption itself, are evidentiary and when established by evidence remain in the record and may be considered by the jury to sustain a finding of the fact presumed, no matter what other facts the record may reveal. If we assume that the testimony introduced on behalf of the defendants took away the statutory presumption of negligence, that does not wipe out the evidence of physical facts, nor the testimony of the witnesses produced by the defendants. The Arkansas decisions do not so hold. Thus, in St. Louis-San Francisco R. Co. v. Cole, 181 Ark. 780, 27 S.W.2d 992, 993, cited and relied on by defendants, the court, quoting with approval from Western & A. R. R. Co. v. Henderson, 279 U.S. 639, 49 S.Ct. 445, 73 L.Ed. 884, said:

" 'The only legal effect of this inference is to cast upon the railroad company the duty of producing some evidence to the contrary. When that is done the inference is at end, *and the question of negligence is one for the jury upon all of the evidence.*' " (Italics supplied.)

In St. Louis-San Francisco R. Co. v. Hovley, 199 Ark. 853, 137 S.W.2d 231, 234, also cited and relied on by defendants, the Supreme Court of Arkansas reviews many of its former decisions, and it again reiterates the doctrine that when the presumption based upon the statute has been overcome, "the question of negligence is one for the jury upon all the evidence." In the last cited case, the court, quoting with approval from St. Louis-San Francisco R. Co. v. Mangum, 199 Ark. 767, 136 S.W.2d

158, 161, said: " 'In other words, after evidence is introduced, the presumption of negligence passes out, and whether the railroad company is negligent is determined from all the evidence introduced.' "

Substantially the same rule is announced by this court in Terminal R. Ass'n of St. Louis v. Staengel, 8 Cir., 122 F.2d 271, 136 A.L.R. 789; Pitcairn v. Perry, 8 Cir., 122 F.2d 881, and Southern R. Co. v. Hussey, 8 Cir., 42 F.2d 70, 74 A.L.R. 1172. In each of these cases we considered the doctrine of res ipsa loquitur. In Terminal R. Ass'n of St. Louis v. Staengel, supra [122 F.2d 275, 136 A.L.R. 789], we said: "The inquiry is whether all the evidence here is so conclusive as to lack of negligence by defendant that, under the above rules of decision, a verdict should have been directed. If so, the evidence must furnish 'an explanation' (San Juan Light & Transit Co. v. Requena, supra, 224 U.S. [89, at] page 99, 32 S.Ct. [399, at] page 401, 56 L.Ed. 680) of the occurrence which is so compelling that no verdict to the contrary should be allowed to stand."

In Southern Railway Co. v. Hussey, supra [42 F.2d 73, 74 A.L.R. 1172], it is said: "In short, it is not enough that the evidence of the defendant would, if true, be sufficient to rebut the presumption, because it is for the jury to pass upon the credibility of the witnesses and the truth of the testimony, but the circumstances must be such that no jury would be justified in rejecting such evidence and no court in sustaining a verdict so doing."

In our consideration of this case we have given no weight to the presumption, but under the facts as shown it was, we think, for the jury to determine whether the defendants exercised that high degree of care and vigilance required of them in closing and keeping closed the traps and doors on the train in which plaintiff's intestate was a passenger. It is mildly suggested that Mr. Harp was guilty of such contributory negligence as to preclude recovery. There is at least a presumption that he was free from contributory negligence. He had a right to assume that the trap and vestibule door were closed and that it was safe for him to pass from one coach to the other, and it can not be said that the evidence establishes his contributory negligence as a matter of law.

The judgment appealed from is therefore reversed and the cause remanded with directions to grant the plaintiff a new trial.