**PULEO v. H. E. MOSS & CO. et al.**

No. 149, Docket 20436.

Circuit Court of Appeals, Second Circuit.

Feb. 20, 1947.

SWAN, Circuit Judge, dissenting.

————◆————

Jacob Rassner, and Bergner & Bergner, of New York City, for libellant.

Raymond Parmer, and Kirlin, Campbell, Hickox & Keating, of New York City, (Vernon Sims Jones, of New York City, of counsel), for H. E. Moss & Company.

Richard F. Lenahan and Macklin, Brown, Lenahan & Speer, all of New York City, for the Todd Shipyard Corporation.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

### L. HAND, Circuit Judge.

H. E. Moss & Company, owner of the tanker, "Lucellum," appeals from a decree in the admiralty which held it solely liable for the death of the libellant's intestate, Peter Puleo. Puleo's administratrix sued the Moss Company for negligence in not finding a safe place for Puleo to work; and the Moss Company impleaded the Todd Shipyard Company, as successor to the Robins Drydock and Repair Company of which Puleo had been an employee, on the ground that the Robins Company had been negligent, and was in any event liable by contract to indemnify the Moss Company. The facts, most if not all of which the judge found, were as follows. The tanker had carried a cargo of gasoline from New York to Manchester in the autumn of 1941. After discharging, she went down the Mersey River, and her crew set about conditioning her for her return voyage in ballast to New York where she was to lade another cargo of gasoline. To do this it was necessary to wash out her tanks and the piping which led from the receiving vents and connected with the tanks. The tanks and piping were flushed with river water, and when the ship was at sea preparatory to joining the convoy the river water was emptied, and enough sea water taken in to serve as ballast for the return trip. On arriving in New York it was found that several of the valves, which controlled the feed into the tanks, and which should open and close from the deck, had stuck, so that they could not be moved either by hand or by wrench. The tanker had to be sent to drydock anyway for more important repairs, and it was decided that, while she was there, it would be desirable

to loosen the valves. On the afternoon of the 30th of June, 1941, Gerard, a foreman, and one, Pointon, an employee of the Robins Company, finding themselves unable to turn the valve to tank seven from the deck, told the tanker's chief engineer, Elliott, that they could not do so, and that in the morning they meant to get a burner and burn off the bolts from the bonnet which covered the valve casing, jack it up and clean the valve; to this the engineer made no answer. It was necessary either to burn or chisel off the bolts, because the nuts which held them had rusted; and that afternoon, preparatory to burning them off, Pointon unscrewed a drain plug at the bottom of the casing and drained off into the bottom of the tank a quantity of liquid. This too was necessary in order to clean out the casing and the valve; and Pointon tasted the liquid as it flowed out but detected no gasoline. The next morning Gerard, Pointon and Puleo went down into the tank with an acetylene torch; Puleo lighted the torch and at once there followed an explosion which caused the death of Puleo and Gerard and which seriously injured Pointon.

It was the Robins Company's custom before using fire on a tanker, to have Healy, a skilled chemist in its employ, go through any compartments where the fire was to be used which had previously been filled with gasoline, and test them for gas. Before Pointon opened the drain plug, Healy made such a test of tank seven, found it gas free and had posted a certificate to that effect in a conspicuous place on the ship, as the custom provided. It was also the Robins Company's custom before any pipe was opened which had contained gasoline, for Healy to make a similar test; but he had not done so in this case, and of

course no such notice was posted. The judge found that "reasonable care to properly and efficiently flush away gasoline and its vapors from the pipes and valves" had not been taken; and this was unquestionably true, if by that was meant that the piping was not made fit to be drained in the presence of fire.

On the 29th of April, 1941, the Maritime Commission and the Robins Company made a contract, by which the Commission was free to send such vessels as it chose to the company for repairs; and the Robins Company agreed to do the work. All parties assume that the tanker was sent to the Robins Company under this contract, Article eight of which provided that the drydocker should "take all reasonable precautions to protect in every way vessels from fire," and that it should "provide all proper safeguards for the prevention of accidents both to material and personnel." Article fourteen of the contract, which we quote in the margin [1] provided generally that the Robins Company would indemnify the vessel owner for any liability for personal injuries incurred in carrying out the work; we reserve for the time being any detailed consideration of the text. The judge found the Robins Company free from fault and appears to have assumed on that account that the contract did not cover the situation; he therefore held the Moss Company solely liable because the tank was not a safe place to work with fire, and he dismissed the petition impleading the Robins Company.

The Robins Company was Puleo's employer and was protected from liability for his death by the Workmen's Compensation Act. Since Puleo was not killed upon the high seas, the plaintiff may not invoke the Death on the High Seas Act; [2] on the

---

[1] "Article XIV. Protection of Government from Suit or Action. The Contractor shall place proper safeguards for the prevention of accidents, and shall put up and keep at night suitable and sufficient lights where necessary during the prosecution of the work and use its best efforts to prevent accidents or injury to the persons or property of another, and it shall indemnify and save harmless the United States, its agencies and instrumentalities, the vessel and the owner of

the vessel from all suits or action and damages or cost of every name and description to which the United States, its agencies and instrumentalities, the vessel or the owner thereof may be subjected or put by reason of injury to the person or property of another arising or growing out of performance of the contract by the Contractor, its servants, agents, or subcontractors."

[2] Chapter 21, § 761 et seq., Title 46, U. S.C.A.

other hand, since a ship in a drydock is within the admiralty jurisdiction,[3] she may sue under the Conservation Act,[4] and her recovery therefore depends upon the Lord Campbell's Act of New York.[5] The decisions of the federal courts upon which both parties rely, are not therefore authoritative, and we must look primarily to those of the New York courts. So far as touches the liability, the New York Court of Appeals has applied the same doctrine to a ship as to premises on land,[6] and it follows that the Moss Company owed to Puleo the same duty which it would have owed to him had he entered its factory or shop to do repairs. As the employee of a contractor who had undertaken such work, he was an "invited person," or as they are now called a "business guest";[7] and in New York the measure of care appears to be the same as that due from an employer to his employee.[8] It is doubtful in any event whether there is any but a difference in form between the duties to a "business guest" and an employee; but, that aside, the New York courts have accepted the form in which the duty to a "business guest" is stated by the Restatement of Torts (§ 343),[9] and, indeed, there have been no substantial variants anywhere in the doctrine since the outset. It demands that the owner shall at least tell the "guest" of any dangers known to him, and not to the "guest."

In the case at bar, it is true that the Moss Company owed no duty to Puleo when it freed its piping of gasoline in England; at that time Puleo had no relation with it of any kind. Whether a duty would have arisen to advise him that the piping had not been thoroughly cleaned, if the master, or the chief engineer, had merely learned that he was to go into the tank to loosen the pipe valves, we do not say. Much could be said in favor of such a duty, if it were

also shown to have been the customary practice to use acetylene torches to open up valve casings. The argument would be that, since the Moss Company knew, or was charged to know, that it might become necessary to clean out the casing and that a step in that was to drain the casing, the owner was charged with knowledge that the liquid which would drain out might contain gasoline and be inflammable. We may reserve that question because of the judge's finding that Elliott learned on the afternoon of June 30th that Gerard and Pointon had been unable to move the valve, and proposed to open the casing with a torch. Elliott personally knew that the pipes had been cleaned only so far as was necessary to protect the ship on her return, and, if he was charged with knowledge that this had not taken out all the gasoline, he was under a duty to tell Gerard and Pointon of the danger involved in using a torch. True, it was not proved that Elliott did know the danger; but he knew what had in fact been done, and he was charged with knowledge of how properly to "gas-free" the pipes. No one else on board was in a position as likely to know, and when Gerard and Pointon told him what they meant to do, they were addressing themselves to him, who of all persons in the ship's company should have known, and whom the owner must have expected to answer. Gerard and Pointon were therefore justified in assuming that in Elliott's judgment the torch would not endanger them.

As we have said, it was the practice of the Robins Company before allowing any fire to be used about an empty pipe, as well as in an empty tank, to have a test made, and a certificate posted. It does not appear whether Elliott knew of this custom, or that it was general in the craft; but for argument we shall assume that it was and

[3] The Jefferson, 215 U.S. 130, 30 S. Ct. 54, 54 L.Ed. 125, 17 Ann.Cas. 907.
[4] § 457, Title 16. U.S.C.A.
[5] § 130 of the Decedent's Estate Law.
[6] Aurigemma v. Nippon Yusen Kaisha, 238 N.Y. 183, 144 N.E. 495.
[7] Casey v. Lehigh Valley R. Co., 128 App.Div. 86, 112 N.Y.S. 522; Lyman v. Putnam Coal & Ice Co., 182 App.Div. 705, 169 N.Y.S. 984.
[8] Hess v. Bernheimer & Schwartz Brewing Co., 219 N.Y. 415, 418, 114 N. E. 808; Dougherty v. Pratt Institute, 244 N.Y. 111, 113, 155 N.E. 67.
[9] Haefeli v. Woodrich Engineering Co., 255 N.Y. 442, 448, 451, 175 N.E. 123; Potter v. New York O. & W. Ry. Co., 261 N.Y. 489, 493, 185 N.E. 708; Petluck v. McGolrick Realty Co., 240 App.Div. 61, 268 N.Y.S. 782; Greenfield v. Hospital Association, 258 App.Div. 352, 16 N.Y.S. 2d 729.

that Elliott knew that the Robins Company followed it. The question then is whether this absolved him of any duty to tell Gerard and Pointon that the pipes had not been properly cleaned to allow the use of fire. We think that it did not. True, the failure to observe this practice, even though the practice was peculiar to the Robins Company, would be evidence of negligence, which might make that company liable, if the Workmen's Compensation Act had not excused it; but it is no defense to the Moss Company that the Robins Company was also at fault and would have been liable but for that statute. The Moss Company can excuse itself only in case Elliott's knowledge of the practice would have justified him in supposing that he need not have added his own word of caution. We do not think that it would. Employees do not by any means uniformly observe the rules and customs which are promulgated for their own safety; their enforcement is a well known problem of factory discipline. Nothing was demanded of Elliott which required an appreciable effort; and we cannot agree when men's lives were at stake, it was proper to rely upon the assumption that all would go as usual, when safety could be so easily assured. We hold with the judge that the Moss Company was liable.

As we have said, he seems to have supposed that if the Robins Company was not at fault, the contract did not compel it to indemnify the Moss Company. We have suggested that the Robins Company may have been in fact at fault, when Gerard allowed the torch to be brought to the tank after the drain plug was opened without learning whether Healy had tested the pipe; but we shall not decide that it was. The Robins Company could in no case be liable, and the contract spoke only in terms of liability, not of fault. The words were to "save harmless * * * the owner of the vessel from all suits, or actions or damages or cost * * * to which * * * the owner * * * may be subjected or put by reason of injury to the person or property of another arising * * * out of performance of the contract by the Con-tractor." If the contract was limited to joint liability, it did not cover injuries to any employee of the Robins Company, for the Robins Company could never be liable to its employees, if it took out workmen's compensation insurance, as it promised to do. It is incredible that the contract should not have included the liability of the Moss Company for injuries to employees; they were far the most likely to occur. Nor is there the least reason to suppose that the indemnity was limited to cases where the Robins Company was at fault, though not liable, unless we impute to the parties an intention to treat the contract in terms of moral disapprobation: an interpolation egregious to its obvious purpose.

■ Although this results in imposing upon the Robins Company liabilities for which the Moss Company would have been solely liable even if the Robins Company did not need the protection of the statute, there is nothing surprising in that. The parties were dealing only with imputed liabilities; the damages had to be paid by one of two groups of persons who would not be personally at fault anyway. We are not to construe the contract as though the Robins shareholders had to pay losses for which the Moss shareholders would be responsible because of any personal delinquency. The losses were imposed as a condition of carrying on the business of the Robins Company; losses of a kind which it has long been the practice to treat as expenses of the business, and to spread over the whole business by insurance of one kind or another. It was in no sense unreasonable therefore that the Robins Company should be willing to escape controversies as to joint and several fault between itself and the ships that came to its yard, to accept liability for all accidents that might occur during repairs, and to load the contract price with the necessary premium. In Porello v. United States [10] the stevedore was also at fault, it is true; but the discussion is not altogether inappropriate here. We hold that the Todd Shipyard Company, as successor of the Robins Company, must indemnify the Moss Company under the contract.

---

[10] 2 Cir., 153 F.2d 605.

The decree against the Moss Company is affirmed; the decree dismissing the petition impleading the Todd Shipyard Company is reversed, and a decree will be entered holding that company primarily, and the Moss Company, secondarily, liable.

SWAN, Circuit Judge (dissenting).

In my opinion Puleo's death was not caused by any breach of duty owed him by the shipowner; it was caused solely by the negligence of employees of the Robins Company who did their work in a manner which they knew, or should have known, was dangerous because they violated one of the safety rules established by their employer.

At the time of the accident Robins and not the shipowner was in control of the vessel. See Pan-American Petroleum T. Co. v. Robins, 2 Cir., 281 97, 107; Gucciardi v. Chrisholm, 2 Cir., 145 F.2d 514, 516. The ship was delivered to Robins without any representation by anyone that its tanks and pipes were free from fumes. From the character of the vessel, a tanker equipped to carry gasoline, Robins was as fully aware as was the shipowner that fumes might still remain in tanks and pipes despite the fact that the tanks had been filled with sea water for ballast on her return voyage. Such knowledge was demonstrated not only by Robins' safety rules of many years' standing but also with respect to this very vessel by Healy's test and certificate. Moreover, the contract for repairs required Robins to "take all reasonable precautions" against fire and to "provide all proper safeguards for the prevention of accidents." Under these circumstances the duty to provide Puleo with a safe place to work was, in my opinion, his employer's, not the shipowner's.

My brothers' opinion makes the shipowner's liability turn on the failure of the ship's chief engineer, Elliott, to give a specific warning to Gerard and Pointon when he learned on the afternoon of June 30th that they intended to burn the bolts off the valve casing the following morning. I agree that that is the crucial issue but I am unable to concur in my brothers' conclusion. Their opinion assumes that Elliott knew of the safety rule requiring a new test and a new certificate before fire was brought into proximity to a pipe which was to be opened; therefore, he had good reason to believe that such a test would be made before the proposed burning operation was begun. Hence his conversation with Gerard gave him no notice that dangerous work was to be undertaken; the work would become dangerous only if Gerard neglected a precaution which Elliott knew was required and which he had no reason to suppose Gerard would neglect. To hold that Elliott was duty bound to say to Gerard "The work you proposed will be dangerous, unless you make the test your employer's rule requires," imposes a standard contrary to what could reasonably be expected of a man in Elliott's position, in my opinion. One can well imagine how Gerard would have reacted to a suggestion that he might be going to do his work negligently and contrary to his employer's rule. To charge the shipowner with responsibility because Elliott failed to make such a suggestion seems to me unreasonable. It must be remembered that Elliott had no authority to direct how the repairs were to be made; nor had he control over those parts of the ship where they were to be made. Consequently, in conversing with Gerard, Elliott was not acting on behalf of the shipowner; he was a mere bystander. Gerard was not consulting him about how to do the work; it was a casual conversation because Elliott happened to be present when Gerard and Pointon found themselves unable from the deck to turn the valve in tank seven. My brothers say "Gerard and Pointon were therefore justified in assuming that in Elliott's judgment the torch would not endanger them." I disagree; they did not tell him they proposed to do the work without making the customary safety test. In my opinion the shipowner should not be held liable for Puleo's death.