**Sarah A. O'LEARY, Administratrix, Plaintiff, Appellant,**

v.

**UNITED STATES LINES COMPANY, Defendant, Appellee.**

No. 4797.

United States Court of Appeals
First Circuit.

Sept. 1, 1954.

Harry Kisloff, Boston, Mass. (Larry Alan Bear, Boston, Mass., on the brief), for appellant.

Thomas H. Walsh, Boston, Mass. (Leo F. Glynn, Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

WOODBURY, Circuit Judge.

The plaintiff in an action against a shipowner to recover for the injury and death of her stevedore husband, alleged to have been negligently inflicted, has taken this appeal from a judgment entered on a verdict returned by a jury for the defendant by direction of the court. The complaint is in two counts. In the first count recovery in the maximum statutory amount is sought for the death of the deceased longshoreman under the Massachusetts version of Lord Campbell's Act. Mass.Gen.Laws, Chapter 229, § 2C. In the second count recovery is sought for the decedent's pain and mental anguish, medical expenses and loss of wages under the Massachusetts statute providing for the survival of actions of tort. Mass.Gen.Laws, Chapter 228, § 1(2). Federal jurisdiction based upon the diversity of the citizenship of the parties and the amount in controversy between them is alleged and clearly established. Title 28 U.S.C. § 1332(a) (1).

On August 31, 1951, the defendant's vessel American Attorney arrived in Boston already fitted to receive a cargo of grain in her No. 4 hold and the deep tanks thereunder, and immediately tied up at a dock in navigable waters. That afternoon the plaintiff's decedent, a veteran longshoreman with several years experience in loading grain, was hired to work on the vessel by an independent stevedoring concern with which the defendant had a contract to load the vessel. The decedent reported on board with his gang about 7 p. m. and was told by his gang boss that the deep tanks in the No. 4 hold were to be loaded first. These tanks, four in number, are located beneath the lower platform or floor of the lower hold, which was 65 feet wide, 81 feet long and 13 feet high. Each tank is 11 feet deep and is fitted with an approximately 9 by 10 foot cover which when in place rests on a coaming extending some 8 or 9 inches above the floor of the hold. The four tanks are arranged side by side in pairs, and are spaced 6 feet apart in the starboard to port direction and 18 feet apart in the fore and aft direction.

When the vessel was fitted to receive her cargo of grain the covers on all four deep tanks in the No. 4 hold were removed and placed to one side, and the tanks were then cleaned and sprinkled with lime to absorb residual moisture. In addition the lower hold was bisected lengthwise by a temporary wooden partition extending from the ceiling to within 3 or 4 feet of the floor the purpose of which was to prevent grain in the hold from shifting from side to side during the voyage. This shifting board, so called, obstructed ladders at either end of the hold leading to the deck above,

leaving an escape ladder located in the aft port section of the hold as the only means of ingress or egress.

The first step taken by the stevedores in preparation for loading the vessel was to remove the two forward sections of the main deck hatch covering the No. 4 hold. When this was done it could clearly be seen that the covers of the two forward tanks had been removed, that the shifting board was in place, and that a "feeder box" had been built and set in position.[1] It could not be seen from the deck, however, whether the covers of the after deep tanks had also been removed or were still in place. While the sections of the hatch cover were being removed the boss stevedore obtained a cluster light from the vessel's mate which was lowered by its cord into the forward starboard deep tank which was to be loaded first. Then a blowing machine belonging to the stevedoring company was hoisted on board by the ship's tackle and lowered through the feeder box into the tank for the purpose of distributing the grain evenly as it came on board.

About 7:15 a stevedore in the gang named O'Halloran was sent below to attach the blower pipe to the machine and guide it to its proper position in the forward starboard tank, and about five minutes later the decedent was ordered to go below to help O'Halloran. Two or three other stevedores in the gang testified that when this order was given they saw the decedent cross the deck in the direction of the escape hatch at the top of the escape ladder leading to the No. 4 hold. O'Halloran returned to the deck about 7:30 or 7:35 and was asked if he had seen the decedent. He said that he had not seen or heard anything of O'Leary, and about five minutes later O'Leary appeared on deck with "an awful lump" on his head, his clothes dishevelled and covered with lime, without his hat, staggering and incoherent in speech, groaning, and complaining of pain in his head, shoulders and back. He was taken by ambulance to a hospital where he was found to be suffering from a fractured skull and other injuries from which he died a few days later.

After the accident O'Leary's hat was found in the after port deep tank in which a 2½ inch pipe extended vertically about 3 feet above the bottom of the tank. This pipe was 1 or 2 feet aft of being under the forward coaming, and foot prints were seen in the lime around it. Also white hand prints were seen on the inside of the coaming but the testimony is conflicting as to whether those hand prints pointed up or down, or whether they were on the forward part of the coaming above the pipe or whether they were on the after part of the coaming near the escape ladder.

On the plaintiff's testimony disclosing the foregoing facts the District Court directed the jury to return a verdict for the defendant on the ground of lack of any evidence from which the jury could reasonably find causal negligence on the part of the defendant.

In Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 the Supreme Court held that the maritime law was augmented or supplemented by state statutes providing for the survival of actions of tort against the estates of deceased tort-feasors, so that in consequence a plaintiff might maintain an action against the estate of a deceased shipowner to recover for injuries resulting from a maritime tort occurring within the territorial waters of the state. Although authority seems to be lacking, no doubt by parity of reasoning the converse is also true, and the plaintiff is entitled by the Massachusetts survival statute cited above to maintain the cause of action stated in the second count of her complaint for her deceased husband's pain, mental anguish, loss of wages, and

1. A "feeder box" is a large bottomless wooden box, measuring about 8 by 25 feet, set inside a section of the hatch between the top deck and the 'tween deck, through which grain is fed into the hold. Usually it is filled with grain so that as the cargo below settles during the voyage grain will be fed into the hold as needed to keep the vessel in balance.

medical expenses. Nor can there be any doubt whatever that she may maintain the cause of action stated in the first count of her complaint for it has long been settled that a state-created remedy for wrongful death will be enforced both in the admiralty courts and in proceedings under the saving clause when death results from a tort committed on navigable waters within a state whose statute provides such a remedy. The Hamilton, 1907, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264; Western Fuel Co. v. Garcia, 1921, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; American Stevedores v. Porello, 1947, 330 U.S. 446, 67 S.Ct. 847, 91 L. Ed. 1011, and the cases cited therein. See also the discussion in Just v. Chambers, supra.

But, although it is perfectly clear that the plaintiff may look to the Massachusetts death act for a remedy, it is by no means clear whether the defendant's liability is to be determined by application of the substantive law of Massachusetts, as ultimately determined by the Supreme Judicial Court of that Commonwealth, or whether its liability is to be determined by application of the general maritime law, as ultimately declared by the Supreme Court of the United States.

The latter court, so far as we have been able to determine, has never addressed itself specifically to the question. In the courts of appeals, however, it has been held several times that one who seeks to recover under a state death statute for a tort occurring on the navigable waters of the state may do so only in accordance with the substantive law of the state in which the tort was committed. See Feige v. Hurley, 6 Cir., 1937, 89 F.2d 575, 578; Klingseisen v. Costanzo Transp. Co., 3 Cir., 1939, 101 F.2d 902, 903 and cases cited, followed and reaffirmed in The H. S. Inc. No. 72, 3 Cir., 1942, 130 F.2d 341, 343 and Puleo v. H. E. Moss & Co., 2 Cir., 1947, 159 F.2d 842, 845, certiorari denied 331 U.S. 847, 67 S.Ct. 1733, 91 L.Ed. 1857. But these cases were all decided prior to Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202 wherein the Supreme Court of the United States in a civil action on the law side under the saving clause for the first time held categorically that the rights of a shore worker to recover for personal injuries short of death occurring on a vessel in the navigable waters of a state resulting from either the negligence of the shipowner or the unseaworthiness of the vessel are to be determined by the general maritime law and not by the law of the state within whose waters the accident occurred. That case, of course, is not squarely in point here, but in the Court's opinion 346 U.S. at page 409, 74 S.Ct. at page 205 it is said by way of dictum that "Even if Hawn were seeking to enforce a state-created remedy for this right, [referring to his right of recovery for unseaworthiness and negligence] federal maritime law would be controlling." Indeed, in our opinion it would be incongruous to hold, in conformity with Pope & Talbot, Inc. v. Hawn, supra, that the maritime law determined the respective rights of the parties in the event of personal injuries short of death, but that state law determined their rights in the event of injuries resulting in the ultimate consequence of death. And, it would be even more incongruous to hold that the husband's right of action, which the plaintiff here asserts in her count two under the local survival statute, is to be determined under the rule of Pope & Talbot by the maritime law, but that the right of action arising out of the same accident conferred directly upon her by the local death act is to be determined by local law. Furthermore, as the Supreme Court pointed out in Chelentis v. Luckenbach S. S. Co., 1918, 247 U.S. 372, 384, 38 S.Ct. 501, 62 L.Ed. 1171, the saving clause reveals no intention that liability as well as remedy shall be determined by the common law rather than the maritime law, and to apply state substantive law to determine the rights of the parties would create divergence in a field where uniformity has long been considered important. See also Chief Judge

Magruder's discussion in Doucette v. Vincent, 1 Cir., 1951, 194 F.2d 834, 839 et seq.

■ In this case, however, we do not, and indeed we cannot except by dictum, pass upon the question of the law applicable to count one. The reason for this is that we do not see how on the evidence a finding of the defendant's causal negligence could reasonably be made under either local or maritime law. Wherefore we do not reach the question of contributory negligence wherein local and maritime law differ radically in that under the former such negligence provides a complete defense whereas under the latter it serves only to mitigate damages. Pope & Talbot v. Hawn, supra.

The plaintiff's theory of the accident is that the decedent descended the escape ladder to the after port section of the floor of the lower hold and in groping his way forward in the darkness to help O'Halloran in the forward starboard deep tank fell into the aft port deep tank where his hat and the footprints were found, from which he extricated himself by standing on the top of the 2½ inch verticle pipe therein and jumping to grasp the coaming and pull himself out. It stretches our credulity to the breaking point to see how a man 5 feet 7 or 8 inches tall weighing between 210 and 220 pounds, however strong, could in strange surroundings find his way in darkness to a 2½ inch vertical pipe two or three feet high which he did not know was there, and then, in spite of a fractured skull which made him delirious and unable to walk without staggering, stand, necessarily on the ball of one foot on top of the pipe and jump high enough, not merely to touch but to grasp, a coaming at least 3 feet higher than his head and 1 or 2 feet away, and then, having accomplished that feat, pull himself out of the tank. Furthermore, there was no evidence of any mark or marks in the lime in the bottom of the tank such as would necessarily have been made by the body of a person falling into it, and certainly such marks had they been there would be as clearly visible as the footprints which were seen. We do not need to speculate, however, as to the precise way in which the decedent met with his fatal injuries, for we cannot see how whatever may have happened could reasonably be attributed to the shipowner's fault.

No claim is made that the vessel involved was unseaworthy in any respect. Both counts sound in negligence generally, that is, without specification of any precise fault, so we must look to see whether there is any evidence from which a jury might reasonably find that the defendant shipowner was negligent in the performance of any duty of care it owed to the decedent as an employee of an independent contractor.

■ The vessel arrived fitted to receive a cargo of grain in her No. 4 hold and the deep tanks thereunder and the master stevedore was so informed. This implied that the covers of those tanks had been removed, and, indeed, when the hatch was opened it could be seen that that was in fact the case as to the forward tanks. And since all four tanks were to be filled, it must have been obvious that in all probability the covers of the after tanks were also off. The other obstructions in the hold, the shifting board and the feeder box, were also to be expected, were constructed in accordance with usual practice, and were obvious. There is no substantial evidence of anything unusual about the structure of the ship or in the way she was fitted to receive the cargo to be loaded, and although the fittings may have created some hazard, they created no unexpected or extraordinary hazard, and none which light would not disclose in all its details. The hold was dangerous only because it was dark, and certainly there was nothing hidden about that danger. Thus any finding of the defendant's negligence must be predicated on a duty to light. But, under the arrangement with the master stevedore, and in accordance with the practice generally followed, the ship's duty was only to provide an adequate number of suitable lights, and the electric power to operate

them (and, perhaps, to connect them), while it was the master stevedore's duty to request such lights as he thought were required and to place them where he thought they were needed. On the evidence it could not be found that the shipowner failed in the performance of its duty. That is to say, there is no evidence that suitable lights were not available on the ship in adequate quantity, or that the lights supplied were defective, or that current was not continuously available to operate them. On the contrary, it appears that the boss stevedore on the job asked the ship's mate on duty for a light, received it, and lowered it into the forward starboard deep tank, and that after the accident he asked for more lights and received all the lights he wanted. Lighting the hold was an incident of the stevedoring operation over which the shipowner retained no control, and if there was any breach of the duty to light, the breach was that of the master stevedore, not that of the shipowner. Cf. Brabazon v. Belships Co., 3 Cir., 1952, 202 F.2d 904, 909; see Berti v. Compagnie De Navigation Cyprien Fabre, 213 F.2d 397, decided by the United States Court of Appeals for the Second Circuit May 26, 1954. Under these circumstances the plaintiff must be content with her remedies under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, without what Mr. Justice Jackson dissenting in Pope & Talbot, Inc. v. Hawn, supra, 346 U.S. at page 419, 74 S.Ct. at page 210 referred to as "a bonus recovery over and above the statutory scale of compensation that Congress has established for injured harbor workers in general".

The judgment of the District Court is affirmed.

HARTIGAN, Circuit Judge (dissenting).

The opinion of the court acknowledges that the Courts of Appeals for the Second, Third, and Sixth Circuits have held that one who seeks to recover under a state death statute for a tort occurring on the navigable waters of the state may do so only in accordance with the substantive law of the state in which the tort was committed. The Court of Appeals for the Fourth Circuit has, likewise, so held in Continental Casualty Co. v. The Benny Skou, 4 Cir., 1952, 200 F. 2d 246 certiorari denied 1953, 345 U.S. 992. The court's opinion indicates these cases are no longer of weight because of a statement, which is admittedly dictum, found in Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406 on page 409, 74 S.Ct. 202. In the Pope & Talbot case the plaintiff, a carpenter employed by an independent contractor, was injured while working on a ship berthed on navigable waters in Pennsylvania. He brought a civil action for damages against the shipowner in a federal district court in Pennsylvania, alleging negligence and the ship's unseaworthiness. A jury found that the ship was unseaworthy, that the shipowner was negligent, and that the plaintiff's own negligence had contributed to his damages. The shipowner contended that the jury finding of contributory negligence should have been accepted as a complete bar to the plaintiff's recovery because Pennsylvania law controls and under that state's law any contributory negligence of an injured person is an insuperable bar to his recovery. In rejecting this contention the court stated in 346 U.S. on page 409, 74 S.Ct. on page 205: "But he was injured on navigable waters while working on a ship to enable it to complete its loading for safer transportation of its cargo by water. Consequently, the basis of Hawn's action is a maritime tort, a type of action which the Constitution has placed under national power to control in 'its substantive as well as its procedural features * * *.' Panama R. Co. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748. And Hawn's complaint asserted no claim created by or arising out of Pennsylvania law. His right of recovery for unseaworthiness and negligence is rooted in federal maritime law. Even if Hawn

were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling. \* \* \* "

It is obvious from this quotation that when the court states federal maritime law controls when the plaintiff seeks to enforce a state created remedy for "this right," the "this right" refers to a right "rooted in federal maritime law." In the Pope & Talbot case the court held that a claim for injuries suffered while working on a ship berthed on navigable waters because of the negligence of the shipowner and the unseaworthiness of the ship was a right rooted in federal maritime law. But in the instant case the plaintiff brought an action for a wrongful death. And it has long been well established that a right of action for a wrongful death is *not* rooted in federal maritime law. The federal maritime law allowed no recovery for a wrongful death. The Harrisburg, 1886, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Western Fuel Co. v. Garcia, 1921, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210; Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903; Levinson v. Deupree, 1953, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319.

Furthermore, the Supreme Court has indicated in numerous cases that in an action brought under a state wrongful death statute, the plaintiff's remedy and the defendant's liability are to be determined by the application of the substantive law of the state. In The Harrisburg, supra, the widow and child of a deceased officer of a schooner brought a suit *in rem* in a federal district court against the Steamer Harrisburg to recover damages for the death of the deceased caused by the negligence of the steamer in colliding with the schooner. The court first held that no such action would lie in the courts of the United States under the general maritime law. The claimants also relied on the wrongful death statutes of Massachusetts and Pennsylvania. The court, having found that the suit was brought after the period of limitations provided in the statutes had expired, ordered that the libel be dismissed and stated in 119 U.S. on page 214, 7 S.Ct. at page 147: "\* \* \* *The liability* and the remedy are created by the same statutes, and the limitations of the remedy are therefore to be treated as limitations of the right. \* \* \* " (Italics ours.) See also Just v. Chambers, supra. In Garrett v. Moore-McCormack Co., 1942, 317 U.S. 239, 245, 63 S.Ct. 246, 251, 87 L.Ed. 239 the court said: "\* \* \* The constant objective of legislation and jurisprudence is to assure litigants full protection for all substantive rights intended to be afforded them by the jurisdiction in which the right itself originates. \* \* \* And admiralty courts, when invoked to protect rights rooted in state law, endeavor to determine the issues in accordance with the substantive law of the State. \* \* \* " The court cites as authority for the latter statement Western Fuel Co. v. Garcia, supra, a case in which the cause of action and defenses to a suit brought in the admiralty court were based on a state wrongful death statute. In Levinson v. Deupree, supra, a libel *in personam* was brought in a federal district court in Kentucky by an administrator seeking damages under the Kentucky wrongful death statute. The court stated in 345 U.S. on pages 651, 652, 73 S.Ct. on page 916: "\* \* \* In the absence of congressional action, the court adopted and enforced the *obligatio* created by Kentucky as it would one originating in any foreign jurisdiction. La Bourgogne, 210 U.S. 95, 138, 28 S.Ct. 664, 679, 52 L.Ed. 973; The Hamilton, 207 U.S. 398, 405, 28 S.Ct. 133, 134, 52 L.Ed. 264. And it was bound to enforce it as it found it, \* \* \*." The court, however, ruled, that an admiralty court was not bound by the "procedural niceties" of Kentucky law.

Finally, in terms of incongruities, if, as the majority opinion suggests, general maritime law determines the liability and state law determines the remedy, then parties asserting rights under a state wrongful death statute arising from a maritime tort may obtain preferential treatment as compared with those asserting rights under the same statute

because of a non-maritime tort. See Stevens, Erie R. R. v. Tompkins and The Uniform General Maritime Law, 64 Harv.L.Rev. 246, 266 (1950).

It is, therefore, my opinion that we must look to the Massachusetts' decisions in order to determine the nature and extent of the defendant's duty with respect to the plaintiff.

In Crimmins v. Booth, 1909, 202 Mass. 17, 21, 22, 88 N.E. 449, 451, 452, the court said: "* * * Apart from contract, the duty of the defendant shipowner toward a stevedore lawfully at work upon his vessel is the same as that of an employer respecting his apparatus and the permanent constructions with and upon which the laborer is expected to work, even though that laborer may be in the immediate employ of an independent contractor. * * * But even when the assumption of risk grows out of a contract, it has never been held to cover those unseen or obscure dangers, which cannot reasonably be discerned by an employe, and which the employer may be properly held to know about. Under such conditions a duty to warn exists on the part of owner or employer, who knows or ought to know the danger, toward the laborer, who does not know and cannot fairly be charged with knowledge of it. * * *" And in Gray v. Boston, R. B. & L. R. Co., 1928, 261 Mass. 479, 482, 483, 159 N.E. 441, 442, the court said: "* * * Apart from special contract, such owner would owe an employee the duty of exercising reasonable care to discover and remedy a defective condition in the premises which was not open and obvious to such employee. * * *" See Cullen v. New England Fuel & Transportation Co., 1925, 253 Mass. 85, 148 N.E. 371. The employer, however, owes "* * * no duty to inform his servant of conditions which are open and comprehensible to any reasonably careful man. The duty of the employer does not relieve the employee from using his eyes and his judgment in regard to things open to his observation. * * *" Murphy v. Furness, Withy & Co., 1927, 259 Mass. 394, 396, 156 N.E. 836, 837.

The issue then is whether or not there is sufficient evidence to require the submission of the case to the jury of the defendant's breach of a duty, as defined above by the Massachusetts courts, and if so, whether said breach caused O'Leary's death. Since this question pertains to the substantive rights of the parties, then under the rule of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, its resolution is determined by the decisions of the Massachusetts courts. Carter v. Kurn, 8 Cir., 1942, 127 F.2d 415; Waldron v. Aetna Casualty & Surety Co., 3 Cir., 1944, 141 F.2d 230; Gutierrez v. Public Service Interstate Transp. Co., 2 Cir., 1948, 168 F.2d 678; Compare Gorham v. Mutual Ben. Health & Accident Ass'n, 4 Cir., 1940, 114 F.2d 97, certiorari denied, 1941, 312 U.S. 688, 61 S.Ct. 615, 85 L.Ed. 1125; See Stoner v. New York Life Insurance Co., 1940, 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284.

In making a motion for a directed verdict, the defendant "* * * admits the truth of all facts which the jury might find in favor of the plaintiff, whatever the nature of the evidence. He admits that if the evidence conflicts, that of the plaintiff is true so far as it conflicts with his own. * * * The court also will make any inference of fact in favor of the party offering the evidence which the evidence warrants and which the jury, with the least degree of propriety, might have inferred." Shea v. American Hide & Leather Co., 1915, 221 Mass. 282, 283, 109 N.E. 158, 159; Horn v. Adamian, 1951, 327 Mass. 77, 97 N.E.2d 167.

In Navien v. Cohen, 1929, 268 Mass. 427, 431, 167 N.E. 666, 668, the court stated that the plaintiff was not "* * * required to exclude all other possibilities as to the cause of the injury if by a preponderance of evidence he proved that it was caused by the defendant's negligence. * * *" The preponderance of the evidence was defined in Sargent v. Massachusetts Accident Co., 1940, 307 Mass. 246, 250, 29 N.E.2d 825, 827, as being the "* * * power to

convince the tribunal which has the determination of the fact, of the actual truth of the proposition to be proved. After the evidence has been weighed, that proposition is proved by a preponderance of the evidence if it is made to appear more likely or probable in the sense that actual belief in its truth, derived from the evidence, exists in the mind or minds of the tribunal notwithstanding any doubts that may still linger there. * * *" See, e. g., Crisafi v. Sells Floto Circus, 1928, 262 Mass. 120, 159 N.E. 611; Marshall v. Carter, 1938, 301 Mass. 372, 17 N.E.2d 205; Rocha v. Alber, 1939, 302 Mass. 155, 18 N.E.2d 1018; Koczur v. Flanagan, 1940, 306 Mass. 121, 27 N.E.2d 483; Thomas v. Spinney, 1942, 310 Mass. 749, 39 N.E.2d 753. Cf. Bigwood v. Boston & N. St. Ry. Co., 1911, 209 Mass. 345, 95 N.E. 751, 35 L.R.A., N.S., 113.

In my opinion the application of the standards enunciated in the above decisions to the evidence in the record warrants the submission of the instant case to the jury

With respect to whether or not there is any evidence in the record upon which a jury might reasonably find a breach of duty by the defendant, the court's opinion correctly states that the master stevedore was informed that the vessel arrived fitted to receive a cargo of grain in her No. 4 hold and the deep tanks thereunder. The court then declares: "This implied that the covers of those tanks had been removed, * * *." I find no justification for this implication in the record. The knowledge that the ship arrived fitted to receive grain in the No. 4 hold implied only that the covers were on, or that covers were off *and* the tanks guarded, or that the covers of the tanks that were to be immediately filled with grain were off and the tanks unguarded. O'Neil, one of the stevedores, testified as follows:

"Q. Well, will you tell us what portion of the ships come in with their tank covers on— A. I can clarify it easy enough. As far as I am concerned or as far as I know all deep tank covers should be on. Some ships come in without them.

"Q. I am not asking what they should be but how do they come in? A. Covered.

* * * * * *

"Q. Now, is there some practice and custom with respect to a provision for guards around the openings of the deep tanks, to your knowledge? A. Well, it has been done—

"The Court: No, no. Is there such a practice or custom; yes or no.

"The Witness: Yes, sir.

"Q. What is the custom and practice with respect to a provision for guards and what is that provision? A. They have four pipes situated at four corners of the tanks and they have cables or chains running through the tops of them, about three foot high."

Fennell, another stevedore, testified:

"The Court: Is there a usual condition with respect to a cargo ship?

"The Witness: Yes, sir.

"Q. What is that usual condition? A. The hatch covers are always on. At times they are not; I mean sometimes there is three on and one off; sometimes two and two.

"Q. What is the usual condition? A. Well, they are on.

"Q. And when you are referring to the hatch covers, what particular hatch covers are you referring to? A. You are speaking about the lower deep tanks.

"Q. Is there some usual provision for guarding a freighter that has deep tanks in the lower bottom? A. Yes, sir.

"Q. What is the usual provision? A. Well, there is a railing put up around the four stanchions, and the chain is supposed to be made fast."

The court correctly states that when the hatch was open it could be seen that

the two forward deep tank covers were off. But the court then declares " * * * since all four tanks were to be filled, it must have been obvious that in all probability the covers of the after tanks were also off." There was evidence, however, that only the two forward tanks were to be loaded with grain during the night of August 31, 1950. O'Neil testified:

> "X–Q. You tell me what they did tell you. A. Mr. Culleton told us to strip the forward end of the hatch, we were going to load grain in the two forward tanks.
>
> "X–Q. That is all he told you? A. That is right."

And even if all four tanks were to be filled with grain during the night, nevertheless, it was not at all obvious that the covers of the after tanks would be off and the tanks unguarded. See Ford v. Allan Line S. S. Co., 1917, 227 Mass. 109, 116 N.E. 505. O'Neil testified:

> "Q. When you remove the tank covers of a deep tank, how many covers do you remove at a time? A. When you are loading on the forward end, as we were, we would remove one at a time. But we would take two off.
>
> "Q. And when you load grain, in how many tanks do you load at one time? A. One."

Fennell testified:

> "X–Q. I am talking now about the openings in tanks on vessels when you are running grain. Describe the guards, the last one you saw around the tanks. A. Well, there is four stanchions around the pipe where the chains are, but in the two tanks you would be working at the time there would be no guards, but the other two tanks would be guarded."

Also, there is ample evidence in the record to warrant a jury finding that the defendant failed to provide the men with an adequate number of lights. O'Neil testified:

> "Q. Will you tell us what the practice is in port with respect to cluster lights when work is to be done? A. The mate or the crew aboard ship put out cluster lights, one on each corner of the hatch.
>
> "Q. Were there any at each corner of the hatch? A. There wasn't any lights on.
>
> "Q. There was none? A. No, sir."

Fennell testified:

> "Q. Can you tell us from your own observation what lights, if any, were provided at the corners—A. There was no lights at the corners of the hatches. There was one light dropped down directly in the tank where the machine was to be placed.
>
> * * * * * * *
>
> "Q. Is there some usual manner for providing lights for working a freighter in the nighttime? A. Yes.
>
> "Q. What is it? A. Well, usually there is a cluster in each corner, and the floodlights are on overhead.
>
> "Q. And where are they usually provided. A. They are right at the deckhouse between the winches. That is where the outlets are.
>
> "Q. And how many are usually provided? A. Four."

Furthermore, I do not believe that the record supports the court's statement that the boss stevedore, Hanlon, asked the ship's mate for *a* light and that only *after* the accident he asked for more lights and received all the lights he wanted. Hanlon testified:

> "Q. All right, tell us what you did when you went aboard the ship? A. Well, when I went aboard the ship, I told the officer to get the lights.
>
> * * * * * * *
>
> "Q. What lights did you get? A. We got one light at that time.
>
> * * * * * * *
>
> "X–Q. How many lights did you have up there, do you know? A. Well, I would think it was two. Two, I guess.

"X–Q. Did you at any time ask the mate for any additional light? A. I asked the mate to get the lights. The mate got a light for No. 4 and I told him we needed another one. We got that some time afterwards.

"X–Q. So he gave you all the lights you asked for during the evening? A. That night, yes."

With respect to the issue of causation, the court states that: "It stretches our credulity to the breaking point to see how * * *" O'Leary under the facts of the instant case could have jumped and pulled himself out of the deep tank. Under all the circumstances here, I do not believe that the court is sufficiently acquainted with the physical strength and ability of O'Leary to make such a ruling as a matter of law. It seems to me that the depth of the tank, the diameter and height of the vertical pipe in the tank and its location, and O'Leary's weight and height, present a jury question as to whether or not he was able to get out of the tank, particularly in view of the following evidence:

1. When O'Leary was ordered to go below to the lower platform, his pants, T-shirt and shoes were very clean. When he returned to the main deck his clothes were covered with lime. The four deep tanks were spread with lime. O'Neil testified that the deep tanks were the only parts of the ship in which there was lime.

2. O'Leary's cap was found in the after port deep tank.

3. Immediately following O'Leary's return to the main deck, footprints were seen in the after port deep tank. No other footprints were seen in any of the deep tanks except those of O'Halloran in the forward starboard tank. There is no evidence tending to show that anybody other than O'Halloran and O'Leary were in the deep tanks between the time when the lime was placed in them and when the footprints and O'Leary's cap were seen in the after port deep tank.

4. Handprints made with lime were seen on the coaming of the after port deep tank.

In addition to the above evidence, the close relationship between the evidence of the negligence of the defendant and O'Leary's injuries strongly tends to show that O'Leary fell into the after port deep tank. See Johnson v. Griffiths S. S. Co., 9 Cir., 1945, 150 F.2d 224; Sadler v. Pennsylvania R. Co., 4 Cir., 1947, 159 F.2d 784. In Brooks v. Kinsley Iron & Machine Co., 1909, 202 Mass. 228, 232, 88 N.E. 771, 772, an employee brought an action against his employer for injuries caused by an explosion which occurred while the employee was pouring molten iron into a pig bed. The trial court directed a verdict for the defendant. The Supreme Judicial Court of Massachusetts reversed, holding that the jury might have found that the explosion was due to the negligent accumulation of rust or moisture in the pig bed. The defendant argued that since such an explosion might have been due to other causes than the negligence of the defendant, it was for the plaintiff to exclude the operation of those causes by a greater weight of the evidence. The court answered this objection in language which is particularly pertinent to the facts of the instant case when it said: "* * * Where the jury have a right to find such actual negligence, followed by the existence of the very danger which might have been expected to arise therefrom, it cannot be said as a matter of law that the plaintiff is bound to go further and to exclude the operation of other possible causes to which conceivably the danger might have been due, instead of having been due to the actual negligence which has been shown. * * *"

In my opinion the judgment of the district court should be vacated and set aside and the case remanded to that court for a new trial.