Mrs. Katie Lyons BYRD, Libellant,

v.

The NAPOLEON AVENUE FERRY COMPANY, Inc., Respondent.

No. 2490.

United States District Court
E. D. Louisiana, New Orleans Division.

Nov. 5, 1954.

---

M. C. Scharff, Gordon B. Hyde, New Orleans, La., for libellant.

Phelps, Dunbar, Marks & Claverie, John W. Sims, New Orleans, La., for respondent.

WRIGHT, District Judge.

Libellant is the widow of Merrill Byrd, who was drowned when a vehicle driven by himself, in company of his wife, fell into the Mississippi River in debarking from a ferry operated by respondent. Alleging that the accident was caused by the negligence of respondent, libellant asks damages for her own injuries, as well as for the death of her husband.

Respondent operates a ferry running across the Mississippi River between Napoleon Avenue, in the City of New Orleans, on the east bank of the river, and the unincorporated town of Marrero, in the Parish of Jefferson, on the west bank. The accident in question occurred at the Marrero ferry landing. This landing consists primarily of a steel pontoon barge measuring 65 feet in length and 25 feet in width. A steel vehicular ramp of truss type construction rests on and runs upward from the pontoon barge to the public roadway at the top of the levee. The shore side of the pontoon barge is maintained in a fixed position by mooring lines made fast to pile clusters, with the result that that side of the barge remains at the same level in the water, while the outboard side of the barge, to which the ferry is moored when taking on and discharging passengers and vehicles, is subject to the rise and fall of the river.

At the time in question, the river was high, so that the outboard side of the pontoon barge was higher than the inboard side which was affixed to the pile clusters. Consequently, when the ferry came alongside to discharge passengers and vehicles, the deck of the ferry was several inches lower than the deck of the pontoon barge.

To assist vehicles in boarding and debarking, a steel apron, which measured approximately 14 feet in length by 46 inches in width, was hinged to the outboard side of the pontoon barge and served to cover the gap between the deck of the ferry and the deck of the pontoon barge. The steel plate of the apron, as well as the steel deck of the pontoon barge, was smooth, except for some corrugations on the apron and some worn-out asphalt which had been applied to the deck of the barge. The apron was supported by steel I-beams 6 inches in height, slightly tapered at the end where the apron rested on the deck of the ferry. As a result, vehicles coming off the ferry had to bounce up the slightly less than 6 inches to get on the apron, which itself was inclined upward rather precipitously to cover the gap between the ferry deck and the deck of the pontoon barge. Movable 2-inch by 12-inch planks of irregular length were placed adjacent to the lip of the apron, tending to reduce the height thereof. Movable wooden planks of similar dimensions were also employed on the deck of the pontoon barge to minimize the drop from the apron, at its hinges, to the deck of the pontoon barge.

The distance from the hinges of the apron on the pontoon barge to the lip of the apron on the vehicular ramp leading to the public road was 16 feet, 6 inches. On the down-river side of the vehicular track across its deck, the barge was fitted with a steel barrier separating the pedestrian and vehicular traffic. On the up-river end of the barge, which was approximately 10 feet from the vehicular track, there was no barrier of any kind. It was over this end that libellant's car plunged into the river. After this accident, the engineer for the Jefferson Parish Police Jury recommended that

the respondent be required to place a barrier at the up-river end of the pontoon barge. At the time this trial was held, that recommendation had not been carried out.

On Sunday, May 17, 1953, libellant's deceased husband, with libellant as a passenger, drove his 1940 model Chevrolet sedan aboard the ferry Joseph Bisso, which was then moored at Napoleon Avenue, for the purpose of crossing the river to Marrero, Louisiana. In accordance with the usual practice, the automobile was parked on the open deck of the ferry, facing aft, and near the deckhouse which was on the stern of the vessel. Approximately twelve to fourteen other vehicles boarded the ferry for this same crossing. Upon arrival at the Marrero landing, the ferry was moored port side to and was secured fore and aft to the pontoon barge with manila lines. The apron was lowered and a 2-inch by 12-inch plank was placed on the ferry deck close to the lip of the apron. The weather was clear and dry and neither the ferry deck, the apron, nor the deck of the pontoon barge was wet, greasy or otherwise slippery, except from the smooth surface of the steel plating.

Libellant's vehicle was the last to leave the ferry, apparently because some difficulty was experienced in starting it. After the engine was started, the automobile was backed to a position on the fore deck of the ferry, forward of the apron, so that in order to approach the apron from this position, Byrd was required to cut his wheels sharply to the right. Instead of approaching the apron from this position slowly and using the power of his engine to get the front wheels of his vehicle onto the apron and up on the pontoon barge, Byrd, apparently realizing that his vehicle might again stall if he attempted to use the power of his engine to climb up and over the apron to the barge, approached the apron at a fast rate of speed in order that the momentum thereby created would assist the vehicle in its climb.

His right front wheel struck the raised lip of the apron first, thereby accentuating the cut of his wheels to the right, throwing the car out of control and into the river. From the photographs in evidence, it appears that the right front wheel of the vehicle struck the raised lip of the apron a severe blow, which blow probably came just as Byrd was attempting to straighten out his wheels to approach the ramp. The force of this blow kept Byrd from straightening out his wheels and allowed the vehicle to continue to the right, across the 46-inch apron, up the barge 10 feet, and into the river. Libellant was rescued from the river by the ferry crew when she came to the surface of the water. Libellant's husband, however, was not seen again until his body was subsequently found.

Libellant contends that her husband's death and her injuries resulted from the negligence of respondent and the unseaworthiness of its landing facilities from which her husband lost his life. She claims damages for her own injuries under the general maritime law and for the death of her husband under the Louisiana wrongful death statute, LSA–C.C. art. 2315. Respondent denies the charge of negligence and unseaworthiness, and, in the alternative asserts that, in any event, libellant's husband's negligence contributed to his death and her injuries and, consequently, under the Louisiana law, her right to recover on either claim is thereby barred.

■ Before attempting to resolve the questions of negligence which this case presents, it may be well to determine under what law these questions should be decided. Libellant would have these questions determined under the general maritime law, whereas respondent would have the law of Louisiana applied. Actually, the general principles of law relating to negligence under both systems are the same. Under the law of Louisiana, however, contributory negligence is a complete bar to recovery of

damages,[1] while under the general maritime law, the doctrine of comparative negligence applies.[2] Since, as will be shown, the negligence of Byrd, as well as respondent, contributed to Byrd's death, the question as to which system of law governs this case becomes a most important one.

In Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 205, the Supreme Court settled the question as to which law applies to maritime tort occurring within the borders of a state, at least insofar as cases not arising under state wrongful death statutes are concerned. There the Supreme Court held that since the basis of Hawn's action was a maritime tort, "a type of action which the Constitution has placed under national power to control," his right of recovery was rooted in federal maritime law and no state law may deprive him of that right. The issue there was identical with the issue here as to libellant's claim for her own injuries. It is true that in Pope & Talbot, the plaintiff was a ship repairman, whereas here libellant was a passenger on a ferry. Nevertheless, the basis of her action, like Hawn's, was maritime tort and there is nothing in Pope and Talbot which would limit its application to maritime tort relating only to ship repairmen.

The doctrine of Pope & Talbot, however, is not broad enough to cover maritime tort where recovery is sought under a state death statute. No death claim was involved in Pope & Talbot, although much is made by libellant over a statement in that case relating to state created remedies for maritime tort.

That statement is, "Even if Hawn were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling." Libellant, with some support from the First Circuit in O'Leary v. U. S. Lines, 215 F.2d 708, contends that the statement in Pope & Talbot means that even where a state wrongful death statute is used to supplement the general maritime law, the principles of the general maritime law must be applied in determining the right to recover. At first blush, it would seem that the statement in question is subject to libellant's interpretation. However, when read in connection with the language which immediately precedes and follows it in the opinion,[3] it becomes clear that it was not the intention of the writer to indicate that when state death statutes are used to supplement the general maritime law, the principles of the general maritime law determine the right to recover thereunder.

First of all, the statement itself makes a distinction between a right to recover and the remedy to be used in enforcing that right. The statement contemplates a right rooted in maritime law and a state created remedy to enforce it. The situation here, as to the death claim for the husband, is totally different. Here there is no right to recover under the general maritime law. Where such a void exists, admiralty courts will allow a state statute to fill the void and provide a right of recovery when so to do it is not hostile to the characteristic features of the maritime law, or inconsistent with federal legislation. Western Fuel Company v. Garcia,

1. Vitale v. Checker Cab Co., Inc., 166 La. 527, 117 So. 579, 59 A.L.R. 148; Belle Alliance Co., Ltd. v. Texas & Pacific Ry. Co., 125 La. 777, 51 So. 846.

2. Pope & Talbot, Inc., v. Hawn, 346 U.S. 406, 74 S.Ct. 202.

3. Pope & Talbot, supra, 346 U.S. at page 409, 74 S.Ct. at page 205 reads: "And Hawn's complaint asserted no claim created by or arising out of Pennsylvania law. His right of recovery for unseaworthiness and neligence is rooted in federal maritime law. Even if Hawn were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling. While states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court. These principles have been frequently declared and we adhere to them. See e. g., Garrett v. Moore-McCormack Co., 317 U. S. 239, 243–246, 63 S.Ct. 246, 249–251, 87 L.Ed. 239, and cases there cited."

257 U.S. 233, 242, 42 S.Ct. 89, 66 L.Ed. 210. Here the very right to recover itself, rooted in state law, is being used as a supplement to the general maritime law and not as a remedy to enforce a pre-existing right rooted in the general maritime law. Mr. Justice Black, the author of Pope & Talbot, realized this distinction when he cites as authority for his explanation of the statement in Pope & Talbot, on which libellant relies, the case of Garrett v. Moore-McCormack, 317 U.S. 239, 63 S.Ct. 246, 251, in which the court, again with Mr. Justice Black as its organ, distinguishes between a right rooted in the general maritime law and one rooted in the state law. There he sought to show that, regardless of the court, federal or state, which supplied the remedy, the system of law in which the right to recover is rooted governs the question of liability. "The constant objective of legislation and jurisprudence is to assure litigants full protection for all substantive rights intended to be afforded them by the jurisdiction in which the right itself originates. Not so long ago we sought to achieve this result with respect to enforcement in the federal courts of rights created or governed by state law (citing Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188). And admiralty courts, when invoked to protect rights rooted in state law, endeavor to determine the issues in accordance with the substantive law of the State." (Citing Western Fuel Company v. Garcia, supra, in which the court applied to a maritime tort, not only to the state wrongful death statute, but the state statute of limitations as well.)

This excerpt from Mr. Justice Black's opinion in Garrett leaves no doubt that when he said in Pope & Talbot, "Even if Hawn were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling," he was not referring to a right to recover under a state wrongful death statute. To so interpret such language is to overrule by dictum, not only the import of Mr. Justice Black's own opinion in Garrett, but also the uniform jurisprudence of the Supreme Court and the Courts of Appeal.[4] In addition, it would be in the teeth of an Act of Congress which specifically provides that an action, brought to recover damages for wrongful death occurring at a place subject to the exclusive jurisdiction of the United States and within the boundaries of a state, will be governed by the law of the state.[5]

It is this court's conclusion, therefore, that the right to recover for maritime tort not involving death and occurring within the borders of a state is governed by the general maritime law, and the right to recover under a state wrongful death statute for a maritime tort is governed by the law of the state.

Returning to the question of negligence, the duty which an operator of a ferry owes to a passenger must first be considered. By reason of the nature of the franchise he exercises and the character of the services he renders to the public, a ferryman is held to the highest degree of care for the safety of his passengers. While he is not an insurer of their safety, he must demonstrate due diligence and regard for the value of human life. He must use rea-

4.  Western Fuel Company v. Garcia, supra; The Alaska, 130 U.S. 201, 9 S.Ct. 461, 32 L.Ed. 923; The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Graham v. A. Lusi, Ltd., 5 Cir., 206 F.2d 223; Continental Casualty Co. v. The Benny Skou, 4 Cir., 200 F.2d 246; Puleo v. H. E. Moss & Co., 2 Cir., 159 F.2d 842, 845; Klingseisen v. Costanzo Transportation Company, 3 Cir., 101 F.2d 902; Feige v. Hurley, 6 Cir., 89 F.2d 575; Truelson v. Whitney & Bodden Shipping Co., Inc., 5 Cir., 10 F.2d 412; O'Brien v. Luckenbach S. S. Co., Inc., 2 Cir., 293 F. 170; Quinette v. Bisso, 5 Cir., 136 F. 825, 5 L.R.A.,N.S., 303; Robinson v. Detroit & C. Steam Nav. Co., 6 Cir., 73 F. 883; cf. Levinson v. Deupree, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319; Just v. Chambers, 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903; Roth v. Cox, 5 Cir., 210 F.2d 76, certiorari granted 347 U.S. 1009, 74 S.Ct. 864.

5.  16 U.S.C.A. 457; Puleo v. H. E. Moss & Co., supra.

sonable care to see that, not only his ferry, but his landing facilities as well, are safe for the purposes intended. It is true that where passengers come aboard the ferry in vehicles under their own control, the ferryman is not responsible for the negligent operation of such vehicles. Nevertheless, he is bound to know that such vehicles are not always operated in a careful and prudent manner and is bound to take such safety precautions to prevent injury as sound judgment and experience require. It is likewise true that facilities of a ferryman need not be the latest, nor the best. Facilities which are reasonably safe and equal to those in common use in similar enterprises are sufficient.

Respondent's facilities do not measure up to the standard of safety required by law. At the time of the accident, the pontoon landing barge, over which vehicles had to pass in leaving or boarding the ferry, listed to port, making the outboard side higher than the ferry deck. In order for libellant and her husband to leave the ferry, it was necessary that their vehicle bump up the elevated lip of the apron and then up the precipitous apron itself in order to get up to the deck of the barge. The fact that loose planks were used to mitigate the effect of these disparate elevations on vehicles attempting to leave or board the ferry is proof that the respondent itself realized the unsatisfactory conditions of ingress to and egress from the ferry it was offering the public. Such conditions were calculated to make a car which approached the apron at a speed other than dead slow go out of control and possibly into the river, just 10 feet away.

Respondent's landing facility at Marrero was a death trap for the unwary. And the fact that there may be other ferry facilities along the river similar to the Marrero landing does not absolve the respondent of fault, particularly where it is not shown that such other ferry facilities are not themselves death traps.

In spite of respondent's unsafe facilities, the accident in suit would not have happened but for the negligence of Byrd in approaching the apron at an excessive speed with his wheels cut sharply to the right. The fact that he may have been afraid his car would stall if he approached the apron at a lesser speed cannot absolve him of negligence. He was responsible for the condition of his car; he must also be responsible for the chances he had to take because of that condition. He was guilty of contributory negligence and that contributory negligence bars any recovery for his death.[6] As to Mrs. Byrd, although the issue of contributory negligence is raised, it is not seriously pursued, nor could it be. She was merely a passenger in her husband's car and she had the right to rely on him. Moreover, it has not been shown that she could have in any way protected herself against her husband's negligence. Even if she were guilty of contributory negligence, her right to recover would not be barred.[7]

As a result of the accident, Mrs. Byrd received a back injury, of which she still complains. In addition, she went through the unbelievable horror of being pulled, drowning, out of the river, only to learn that her husband had not been saved.[8] Her damages are assessed at $10,000.

6. Vitale v. Checker Cab Co., supra.

7. Pope & Talbot, Inc., v. Hawn, supra.

8. As explained in the text of the opinion, there can be no recovery in the case for shock or other damage resulting from death of libellant's husband. See LSA–C.C. art. 2315; Vitale v. Checker Cab Co., supra.