Clara M. WHORTON, Appellant,

v.

T. A. LOVING AND COMPANY,
Appellee.

No. 9403.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 24, 1964.

Decided April 6, 1965.

**740**

Stephen J. Buckley, New York City (John H. Bonner, Washington, N. C., Christopher E. Heckman, and Foley & Martin, New York City, on brief), for appellant.

Jno. C. Rodman (Rodman & Rodman, Washington, N. C., on brief), for appellee.

Before BOREMAN and J. SPENCER BELL, Circuit Judges, and BUTZNER, District Judge.

BOREMAN, Circuit Judge:

Clara M. Whorton prosecutes this appeal from a decree in admiralty sustaining the motion of appellee, T. A. Loving and Company (hereinafter Loving), to dismiss appellant's libel. We think the dismissal was error.

In midafternoon of February 16, 1955, the weather clear and visibility good, Whorton's shrimp boat, Boots, was proceeding southbound in the Intracoastal Waterway, near the "new" Onslow Beach Bridge, Camp LeJeune, North Carolina. The Boots was sixty feet long, fifteen feet wide and nine or ten feet in depth. As the Boots approached the bridge, she signaled for the opening of the drawbridge. A Navy landing craft was approaching the bridge from the opposite side, proceeding northbound, and the forward movement of the Boots was stopped to allow the oncoming craft to pass through the draw. The Boots' engines were then put ahead and suddenly the bottom of the boat was holed when it struck an unseen, unidentified and unmarked object, causing the Boots to sink in the draw of the bridge.

The location of the accident was opposite the U. S. Marine Corps Base at Camp LeJeune. Thomas Dillon, cartographer and Chief of Surveys of the Public Works Department at LeJeune, was directed to locate the underwater object which caused the sinking. On the day of the accident and on the following day, Dillon, with a crew in a small boat, dragged the area with a steel cable and located a solid immovable object under water. Looking through a specially made device, Dillon identified the object in the water as a steel "I" beam or pile (also referred to in the testimony as an "H" beam or "H" pile) in a fixed and semiupright position, embedded in the bottom of the waterway, its top 1.85 feet below the surface of the water. The crew marked the beam with a red flag.

Dillon then located the red marker in relation to a known position and prepared a plan to scale showing the position of the beam in relation to the fender system on the north side of the new Onslow Beach Bridge and in relation to an old pontoon bridge which had been removed but which had been located about one hundred yards to the north of the new bridge. This witness, who was

familiar with the construction of the old bridge, testified that, ahead of and forming part of its fender system on the south side, there had been two dolphins on the west and two dolphins on the east side of the waterway; that these dolphins acted as protection to the fender system and each was comprised of a vertical steel beam or pile embedded in the river bottom and four wood piles leaning toward the vertical beam in tepee fashion. The plan prepared by Dillon showed the positions of these dolphins and alongside of one there appeared a legend which he explained as follows: The steel beam which he found was deflected slightly from true vertical and was leaning in a northerly direction; the top of the beam was 1.85 feet below the surface of the water; the water depth was at least ten feet and the top of the beam was approximately 8.15 feet from the bottom. On another copy of the same plan Dillon marked the top of the beam that caused the sinking of the Boots. Because of the northerly deflection of the beam, the top is shown slightly to the north of the vertical beam of one of the dolphins which formed a part of the old bridge system. Dillon testified that the embedded beam which caused the sinking was the same kind of steel beam used in the construction of the dolphin.

In essence, the libel charged that, prior to February 16, 1955, Loving entered into an agreement with the U. S. Department of the Navy whereby Loving undertook the construction of a bridge over the Inland Waterway in the vicinity of Onslow Beach, and the demolition and removal from the navigable waterway of the structure then in existence; that in performing the contract it was Loving's duty to remove any and all submerged obstructions the presence of which had previously been indicated by the existence of the bridge structure above the level of the water; that Loving failed and neglected to remove from the channel all of the parts of said bridge structure, including a submerged piling which constituted an obstruction to navigation; that Loving was responsible for the pres-

ence of said obstruction by reason of its negligence in failing to remove it and in failing to give appropriate warning thereof to vessels, including the Boots, lawfully using said waterway; that the damage to the Boots was due to the fault, neglect and want of care on the part of Loving and to Loving's failure to perform the obligations imposed upon it by reason of its Navy contract and the obligations and duties imposed by the statutes of the United States "and otherwise."

Answering, Loving admitted that it had entered into a contract with the Navy for the construction of a new bridge and for the removal of an existing bridge but denied that said contract was in any way pertinent or relevant to Whorton's alleged cause of action. Loving further denied knowledge of the existence of any such submerged piling and denied any and all responsibility for the presence thereof.

Without objection the issues for trial were stated by the court in a pretrial order as follows:

Was libellant's boat damaged by the negligence of respondent as alleged in the libel? If so, what damages is libellant entitled to recover?

In a written statement of facts, filed as a part of the record, Loving stated that, under its contract with the Navy, dated March 4, 1953, it constructed the new bridge; that a part of its contract provided for the removal of the old bridge; that at the time of the sinking of the Boots the new bridge had been constructed and was in use, the new bridge had been accepted by the Navy, the removal of the old bridge had been completed and the completion of such removal had been fully approved by the Navy. Loving again denied that the accident had been caused by its negligence.

At the conclusion of Whorton's evidence Loving moved to dismiss. The court took the motion under advisement and at that time reserved its ruling on the admission into evidence of the contract of March 4, 1953, hereinbefore mentioned, which had been offered by

Whorton. Thereupon Loving produced one witness, Peel, who testified that, for over twelve months prior to the accident, no part of the dolphin, of which the steel beam was alleged to have been a part, was visible above water and that boats had passed through that area without incident. At the conclusion of Peel's testimony the court announced that it would admit the contract of March 4, 1953, for the limited purpose of showing that Loving undertook the removal of the old structure or bridge pursuant to contract and, further, that the court had concluded to allow Loving's motion to dismiss the libel.

One section of the contract which appears to be specifically applicable to the removal of the old bridge structure provided:

> "The fixed parts and the fender system shall be completely removed and stored on the northwestern shore as directed. Piles shall be pulled or cut at canal bottom."

Under the terms of the agreement, the entire project was to be completed by August 31, 1954. A report dated November 9, 1954, and signed by W. H. Wendt, Inspector, discloses that the contractor on that date checked the waterway for obstructions and that this operation completed the removal of the old bridge.

At the time the court announced its ruling, proctor for Loving was directed to submit proposed findings of fact. Later the court adopted the proposed findings and conclusions substantially as submitted.[1] The court made no specific finding that the beam which caused the damage was a part of the fender system of the old bridge. It did find that there was no evidence as to when the removal of the old bridge and its appurtenances was accomplished or as to when the contract was completed in its entirety; that

there was no evidence to show whether the steel beam which caused the damage was present in a semiupright position or in any other position when Loving's government contract was completed; that there is no evidence that Loving failed in the discharge of any legal duty owed by it to Whorton. The court then concluded that Whorton had failed to establish that the damage to the Boots was due to any fault, neglect or want of care on the part of Loving, its agents, servants, or employees, and that Loving was not liable.

We are of the opinion that the evidence before the trial court was amply sufficient to create and support the inference that the Boots sank as a result of striking a steel "I" beam, part of the fender system of the old bridge, which Loving was under an obligation to remove; in fact, such an inference is, in our opinion, inescapable. Short of producing as a witness someone who participated in driving the beam into the bottom of the waterway during the construction of the old bridge and who could, by some means, identify that particular beam as the one that caused the damage, it is difficult to conceive what other proof Whorton could have produced. Direct evidence of a fact is not always required. Circumstantial evidence is not only sufficient but may also be more certain, satisfying and persuasive than direct evidence. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330, 81 S.Ct. 6, 5 L. Ed.2d 20 (1960). In Williamson v. Williams, 137 F.2d 298, 299 (4 Cir. 1943), this court said: "* * * inferences arising from admitted circumstances may sometimes be strong enough to outweigh the most positive and direct oral statements." Fact finding does not require mathematical certainty. Schulz v. Pennsylvania R. Co., 350 U.S. 523, 526, 76 S.Ct. 608, 100 L.Ed. 668 (1956).

---

1. This court stated in The Severance, 4 Cir., 152 F.2d 916, 918 (1945), that this practice, although not a ground for reversing the decree, was not to be commended:

"* * * We content ourselves by observing that these findings of fact and conclusions of law are not, at our hands, entitled to the same weight and dignity which they would have possessed had they represented the unfettered and independent judgment of the trial judge."

It cannot be determined from the findings of the lower court what inference, if any, it drew from the proven facts as to the nature or location of the obstruction which caused the damage. The court did find there was a steel beam between the old and the new bridges. The evidence shows that this beam was found where the Boots struck. The court did not find that the object which sank the Boots was *not* part of the old bridge structure. Any such finding would have required the court to indulge in speculative assumptions that extraordinary circumstances might have existed which, if established, made the only reasonable inference untenable. There was no evidence and no finding that the damage to Whorton's boat was caused by something other than a part of the old bridge structure. Nor was any other reasonable explanation offered for the presence of a steel beam in a semiupright position in that waterway. We think that no inference other than that the beam was part of the old bridge structure can reasonably be drawn from the proof of a steel beam standing almost upright, firmly embedded in the bottom, at a place where a steel beam of the same type and kind was shown to have stood before. The court's failure to find that the damage to the Boots was caused by part of the old bridge structure was error.

Loving insists that it owed no duty to Whorton with respect to the removal of the old bridge and appurtenances since Whorton was not a party to the contract. The District Court found that there was no evidence as to when the removal of the old bridge and appurtenances was accomplished but in this the court obviously erred. It may be said that the *exact* date was not clearly established but Loving admitted in a statement filed before trial that this work had been completed and the newly constructed bridge had been accepted prior to the date of the accident. Furthermore, an inspector's report indicates that the removal of the old bridge was completed on November 9, 1954, approximately three months before the accident here involved. From Loving's brief and argument it is clear that completion of the removal project and acceptance of the new bridge were asserted in defense of any claim of liability to Whorton under the circumstances.

At the outset, a question of import is whether Loving & Company, performing work under the terms of a contract with the Navy Department, can be held liable to Whorton or other persons not parties to the contract after the work was completed and accepted by the government. A general rule in this country and in England was that a contractor, manufacturer or vendor was not liable to third persons not in contractual relationship with him for negligence in the construction, manufacture or sale of articles. Huset v. J. I. Case Threshing Machine Co., 120 F. 865 (8 Cir. 1903); see also, Savings Bank v. Ward, 100 U.S. 195, 25 L.Ed. 621 (1879). The basis for this rule derived from the old English case of Winterbottom v. Wright, 10 M. & W. 109, 152 Eng.Rep. 402 (Ex. 1842), where the court held that in the absence of privity of contract a contractor who had agreed to supply mail coaches to the Postmaster General and to keep them in repair could not be held liable to a driver of one of the coaches who was injured when the coach collapsed. As with other general rules, exceptions developed to prevent injustice. See Huset v. J. I. Case Threshing Machine Co., supra, and cases therein cited; Prosser on Torts, pp. 498–99 (2d Ed. 1955). But the general rule remained. It was said to be based on public policy for if the supplier was to be held liable for his acts to third persons not in privity with him, there would be no end to litigation. For a comprehensive analysis and a compilation of cases in this area of tort law see Annotations, 123 A.L.R. 1197 (1939); 164 A.L.R. 569 (1946); 13 A.L.R.2d 191 (1950); 58 A.L.R.2d 865 (1958).

In 1916 the landmark decision of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, set a new precedent for fixing tort liability of manufacturers. Whether

that decision in effect overruled prior law or merely enlarged the "inherently dangerous instrumentality" exception to the point that it emasculated the general rule (compare Annot. 164 A.L.R. 569, 588, with Prosser on Torts, pp. 499–500 (2d Ed. 1955)), it has effectively abolished the privity requirement and it is safe to say that the principles announced in that decision are today applicable where tort liability of manufacturers is in question. Because of their wide acceptance, the principles announced in the MacPherson case have been construed to be part of the general maritime tort law. Sieracki v. Seas Shipping Co., Inc., 149 F.2d 98 (3 Cir. 1945), affirmed, Seas Shipping Co., Inc. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); The S. S. Samovar, 72 F.Supp. 574 (N.D.Calif.1947); Todd Shipyards Corp. v. United States, 69 F. Supp. 609 (D.C.Maine 1947).

The principles applied in MacPherson were not rapidly applied to contractors despite the apparent basic similarity between a manufacturer and a contractor. The leading contractor case was Ford v. Sturgis, 56 App.D.C. 361, 14 F.2d 253, 52 A.L.R. 619 (1926), certified question dismissed per curiam, 266 U.S. 584, where the court refused to impose liability upon a contractor who had constructed a theater which collapsed from a defect in the construction after the work had been completed and accepted by the owner. The court based its conclusion on three theories: (1) After the building had been completed and accepted, the liability of the builder for accidents caused by defective construction ceased and attached to the owner, whether the damage was a result of the owner's negligence or that of the builder; (2) public policy required such a result for otherwise there would be no end to litigation; and (3) the negligence of the owner in maintaining the defective building, and not that of the builder in constructing it, was the proximate cause of the injury to third persons. However, that same court did recognize certain exceptions which were analogous to those applied by the courts to the rule established in Winterbottom v. Wright, supra. See also, Prosser on Torts, p. 518 (2d Ed. 1955).

These exceptions to the general rule of independent contractor nonliability have been applied to so many diverse factual situations, sometimes with inconsistent results, that it is difficult to determine precisely the present state of the law. See Annots. 58 A.L.R.2d 865, 871; 13 A.L.R.2d 191, 233. However, a trend is indicated in that several recent decisions have expressly overthrown the general rule of nonliability and have adopted the view as applied to manufacturers in the MacPherson case.

In Hanna v. Fletcher, 97 U.S.App. D.C. 310, 231 F.2d 469, 58 A.L.R.2d 847 (1956), cert. denied sub nom. Gichner Iron Works, Inc. v. Hanna, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501, the court overruled its prior decision in Ford v. Sturgis and held that a building contractor could be held liable to the tenant of the owner provided the facts proved the contractor negligent. The Third Circuit indicated that the negligence principles applied to manufacturers would be applicable to building contractors under Ohio law. Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 166 F.2d 908, cert. denied, 334 U.S. 846, 68 S.Ct. 1516, 92 L.Ed. 1770 (1948). State courts have recently taken the same approach. In Russell v. Arthur Whitcomb, Inc., 100 N.H. 171, 121 A.2d 781 (N.H.1956), the defendant company was hired to construct a sewer line by a municipality. The sewer line passed within ten to twelve feet of plaintiff's buildings which were damaged when the company failed to properly refill the excavation made for installing the sewer. The court held that plaintiff was entitled to recover for damages to his buildings after acceptance of the work by the city. It stated at page 782:

"We adopt the view outlined by Prosser that independent building and construction contractors should be held to a general standard of reasonable care for the protection of third parties who may be foresee-

ably endangered by the contractor's negligence even after acceptance of the work. * * *"

The court added the qualification that if the employer or owner discovered the danger or it was obvious to him, then his responsibility superseded that of the contractor. A contractor who installed a kitchen wall cabinet was held liable to a tenant of the owner who was injured when the cabinet fell. Marine Ins. Co. v. Strecker, 234 La. 522, 100 So.2d 493 (La.1958). The court stated at page 496:

> "Finally, as we view the matter, there exists no valid reason for excusing a contractor from liability in a tort action on the privity of contract doctrine or because of want of contractual relations between the contractor and the injured party. * * * The contractor, of course, may escape liability under substantive tort law if, for instance, there is no proof of his negligence, no establishment of the fact that the injury or damage was foreseeable or that danger from defective construction would be probable, or no proof that the injury was proximately caused by the contractor's conduct."

Other state courts have taken the same approach. Strakos v. Gehring, 360 S.W. 2d 787 (Tex.1962); Leigh v. Wadsworth, 361 P.2d 849 (Okl.1961); Dow v. Holly Manufacturing Co., 49 Cal.2d 720, 321 P.2d 736 (1958); Inman v. Binghamton Housing Auth., 1 A.D.2d 559, 152 N.Y.S. 2d 79 (1956). See also, Annot., 58 A.L.R. 2d 865, 891; 27 Am.Jur., Independent Contractors, § 55 (1964 Cum.Supp.); Restatement of Torts, §§ 385, 404; Prosser on Torts, p. 519 (2d Ed. 1955).

■ North Carolina does not appear to be among the states which have adopted the "modern" view applied to contractors. However, the instant case involves a maritime tort and the rights of the parties must be determined by general maritime principles and not state law. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 409, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Byrd v. Napoleon Ave. Ferry Co., 125 F.Supp. 573, 577 (E.D.La.1954), aff'd 227 F.2d 958 (5 Cir. 1955), cert. denied 351 U.S. 925, 76 S.Ct. 783, 100 L.Ed. 1455 (1956). Two cases have been discovered in which this question was considered by a court sitting in Admiralty. The results are conflicting. In The Wonder, 79 F.2d 312 (2 Cir. 1935), a subcontractor which had laid a power cable for a drawbridge in a negligent manner was held liable as a joint tortfeasor with the City of New York for damage caused to a tug when its propeller picked up the cable although the work had been completed five months before the accident. The opposite result was reached in D. M. Picton & Co. v. Eastes, 160 F.2d 189 (5 Cir. 1947). Without citing any authority for its conclusion and without stating its reasons, the court there held that Picton & Company, which had entered into an agreement with an oil company to remove some damaged piling and timbers from a navigable waterway, owed no duty to the owner of a motorboat which was damaged when it struck a submerged pile.

■ As stated earlier, the MacPherson doctrine as to the liability of manufacturers has been applied and accepted as part of the general maritime law. The modern trend of the authorities is toward acceptance of the view that there is no valid reason for drawing a distinction between a contractor and a manufacturer. It is stated in 58 A.L.R.2d at page 872:

> " * * * Both reason and justice revolt against a further retention of the old rule with its potentially unfair results based on nothing but antiquated legal concepts and refuted hazy ideas of public policy. There can hardly be any doubt that liability should issue from negligence in the face of a danger to others that may be reasonably foreseen. * * *"

We are in accord with these statements and think that this principle should be part of the general maritime law if this result has not already been achieved.

■ This extension of the rule does not, however, impose absolute liability upon contractors and the recent cases so hold. The plaintiff must prove the contractor's negligence and that such negligence is a proximate cause of his injury; furthermore, he must prove that he is within the class protected, that is, one as to whom the consequences of negligence may be foreseen. Hanna v. Fletcher, supra, 97 U.S.App.D.C. 310, 231 F.2d 469, 473 (1956). Notwithstanding antiquated legal concepts, we think it is consistent with sound public policy that liability for personal injury or damage to property should issue from negligence which creates a reasonably foreseeable danger to others. Experience with the identical issue in manufacturing and products liability cases clearly refutes any suggestion that the application to contractors of the principles of the Mac-Pherson case would impose an absolute liability. In every instance resolution of the ultimate issues, i. e., was the contractor negligent and did this negligence proximately cause the injury, must depend upon the facts and circumstances.

■ Following what we conceive to be the modern trend and the better view, we conclude that the "completion" of the agreed undertaking of removal and the acceptance of the work by the Navy will not provide a defense for Loving in the instant case. The record shows conclusively that Loving agreed to completely remove the fixed parts of the fender system and to pull out piles or cut them at the canal bottom. One obvious purpose of the contract was to effect the removal of hazards to navigation. Whorton is clearly within the class protected, that is, one as to whom the consequences of failure to remove from the navigable waterway a beam or pile by pulling it out or cutting it off at canal bottom may be foreseen. Loving exposed itself to liability for foreseeable damage to the property of third persons, including Whorton, caused by its negligence in the performance of its contract even though the work had been completed by it and accepted by the contractee.

■ The number of dolphins to be removed, each with a vertical steel beam in the center, was well established by the evidence. The location of each was easily ascertainable as shown by the unchallenged testimony of Mr. Dillon. There was evidence that Loving "checked" the waterway for obstructions and that this operation completed its contract of removal. However, it is undisputed that within a very short time after the sinking of the Boots, a crew in a small boat discovered the offending beam by the very simple method of using a steel cable in a dragging operation. These facts and circumstances would be sufficient to support the strong inference that Loving was negligently at fault in failing to perform its contract of removal and in leaving in the waterway an obvious navigational hazard. We are of the opinion that the finding below of no evidence that Loving failed in the discharge of any legal duty owed by it to Whorton and the conclusion, based upon incomplete and inadequate findings, that Whorton had failed to establish that the accident was due to any fault or want of care on the part of Loving, were clearly erroneous. Therefore, it was error to grant the respondent's motion to dismiss.

Libellant contends that, in the event the order of dismissal is found to have been erroneously entered, this court should dispose of the liability issue by entering a decree in her favor rather than send the case back for a new trial; Loving contends that it should not, in any event, be precluded from presenting all of its evidence bearing on the question of negligence and from producing witnesses "whose testimony will tend to completely exonerate it of any liability to libellant."

■ It is now settled beyond all question that appeals in admiralty are not trials *de novo*. United States v. S. S. Soya Atlantic, 330 F.2d 732, 735 (4 Cir. 1964). This court will not render a decree based upon the evidence contained in the record presented on appeal. For the reasons stated our ultimate hold-

ing is that it was error to dismiss the libel. The case will be remanded for a new trial on the issue of liability and for any further necessary proceedings.

Reversed and remanded.